Battle, J.
 

 'The proceedings in this case are a movelty in ■the administration or criminal justice in this State, and but for the light which is flu-own upon them by some recent >de
 
 *141
 
 cisions in that country from which our common law is derived, Ave might find a difficulty in dealing-with them.
 

 In
 
 Rex
 
 v.
 
 Dyson,
 
 which is reported in
 
 2
 
 Lewin’s Cr. Cas. 64, and also in a note to
 
 Rex
 
 v.
 
 Pritchard, 82
 
 Eng. C. L. Rep. 518, the prisoner was indicted for the murder of her bastard child, by cutting off its head. She stood' mute; and a j-ury Avas empannelled, to try whether she did’ so- by malice or by the visitation of God ; and evidence hatdngbeen given of her ahvays having been deaf and dumb, the jury found that she stood mute by the visitation of God.
 

 The learned Judge then examined a Avitness on oa-th, who* swore that he was acquainted' with her, and that she could be made to- understand some things by signs, and could give her ansAvers in the same way. The Avitness was then SAVorn as follows : “ Yon swear, that you will well and truly interpret, and make knoAvn to the prisoner at the bar, by such signs, ways, and methods, as shall be best known to you, the indictment AvhereAvith she stands charged ; and also, all such matters and things as the Court shall require to be made knoAvn to her; and also, well and truly to interpret to the Court, the plea of the said prisoner, to the indictment, and all answers of -the said prisoner to the said matters and things so required to be made known to her, according to the best of your skill and understanding. So help you God.”
 

 The Avitness then explained to her, by signs, what she Avas charged Avith, and she made signs, which obviously imported a denial, and Avhich he explained to be so. This being done, the Judge directed a plea of “not guilty” to be recorded.— The AAntness was then called upon to explain to her, that she was to be tried by a jury, and that she might object to such as she pleased; but, he and another witness stated, that it was impossible to make her understand a matter of that nature ; though, upon common subjects of daily occurrence, which she had been in the habit of seeing, she was sufficiently intelligent. One of the witnesses had instructed her in the dumb alphabet, but she was not so far advanced as to put words together, and the Avitness swore, that, though she was
 
 *142
 
 then incajiable of understanding the nature of the proceedings against her, and making her defense, yet he had no doubt that with time and pains, she might be taught to do so by the means used for the instruction of the deaf and dumb.
 

 The Judge (Mr. Justice J. Parke) then directed the jury to be empannelled and sworn, to try whether she was sane or not; whereupon, the same witnesses were sworn and examined, and proved her incapacity, at that time, to understand the mode of her trial, or to conduct her defense.
 

 The Judge, in charging the jury so empannelled, referred to Lord Hale, who, in his Pleas of the Crown, Yol. 1st, page 34, says, “If a man, in his sound memory, commits a capital offense, and, before his arraignment, he becomes absolutely mad, he ought not, by law, to be arraigned during such his plirensy, but be remitted to prison until that incapacity be removed. The reason is, because he cannot, advisedly, plead to the indictment. And if such person, after his plea and before his trial, become of nonsane memory, he shall not be tried; or if, after his trial, he become of nonsane memory, he shall not receive judgment; or, if after judgment, he become of nonsane memory, his execution shall be spared; for,' were he of sound memory, he might allege, somewhat, in stay of judgment or execution. Put, because there may be great •fraud in this matter, yet, if the crime be notorious, as ti’eason or murder, the judge, before such respite of trial or judgment, may do well to empannel a jury to enquire
 
 ex
 
 officii), touching such insanity, and whether it be real or counterfeit” The Judge then told the jury, that if they were satisfied that the prisoner had not
 
 then,
 
 from the defect of her faculties, intelligence enough to understand the nature of the proceedings against her, they ought to find her “ not sane,” which they accordingly did. His Lordship, thereupon, ordered her to be kept in strict custody, under the 39 and 40 Geo. 3, chap. 94, sec. 2, till his magesty’s pleasure should be known.
 

 A similar cause oecnred afterwards, before Baron Alderson, (See
 
 Rex
 
 v.
 
 Pritchard, 7,
 
 Car. and Payne, 303, 32 Eng. C. L. Rep. 517) when he refered to
 
 Rex
 
 v.
 
 Dyson,
 
 and said the
 
 *143
 
 course which Mr. Justice Parke had pursued, had been approved of by several of the Judges, and that he should follow it. He accordingly had a jury empannelled, and told them that there were three points to be enquired into.
 
 “
 
 First, whether the prisoner is mute of malice or not; secondly, whether he can plead to the indictment or not; thirdly, whether he is of sufficient intellect to comprehend the course of the proceedings on the trial, so as to make a proper defense; to know that he may challenge any one of you to whom he may object, and to comprehend the details of the evidence, which, in a case of this nature, must constitute a minute investigation. Upon this issue, therefore, if you think there is no certain mode of communicating the details of the trial to the prisoner so that he can clearly understand them, and be able, properly, to make his defense to the charge, you ought to find that he is not of sane mind. It is not enough that he may have a general capacity of communicating on ordinary matters.” The jury returned a verdict that the prisoner was not capable of taking his trial.
 

 We have stated these cases with more than usual particularity, because they set forth clearly, the true grounds upon which a deaf and dumb prisoner, whose faculties have not been improved by the arts of education, and who, in consesequence thereof, cannot be made to understand the nature and incidents of a trial, ought not to be compelled to go through, what must be to him, the senseless forms of such a trial. Whether arising from physical defect or mental disorder, he must, under such circumstances, be deemed “ not sane,” and of course, according to the great authority of Lord Hale, he ought not to be tried. The allowance to prisoners in this State the full benefit of counsel in every thing connected with their trial, has not been deemed sufficient to change the law as to one mentally insane, and we think it cannot have that effect in a case, like the present, of a defect of the physical faculties. The proceedings in the present case, including the instructions given to the jury by the presiding Judge, are substantially the same as those in the English cases to which
 
 *144
 
 'we have referred, and we now declare our- approbation of1 them.
 

 It will be borne in mind, however, that when-.-a jury is empannelled in this State, in the ease of'a deaf and dumb prisoner, there is no need of an issue to-enquire, whether he stands mute of malice, because, even if he could speak, and yet stood mute designedly, the Court must ord'er the plea of “not guilty” to be entered'for him, as requiredfoy the-Rev. .Code, ch.. 35, sec. 29.
 

 It must be-certified to.the Court below, that there is no-error in the record.
 

 Per Curiam,
 

 Judgment-affirmed'..