### STATE v. THEOPHILUS COOPER.

(Filed 28 February, 1968.)

**1. Criminal Law §§ 90, 104—**

The introduction by the State of testimony of a defendant which in-
cludes exculpatory statements does not prevent the State from showing
the facts concerning the crime to be otherwise, and on motion to nonsuit,
only evidence favorable to the State will be considered.

**2. Homicide § 14—**

When it is admitted or when the State satisfies the jury from the evi-
dence beyond a reasonable doubt that defendant intentionally shot de-
ceased with a deadly weapon and thereby proximately caused his death,
the presumptions arise (1) that the killing was unlawful and (2) that
it was done with malice, thereby constituting the felony of murder in the
second degree.

**3. Same—**

When presumptions from the intentional use of a deadly weapon obtain, the burden is upon defendant to show to the satisfaction of the jury the legal provocation that negates malice, thus reducing the offense to manslaughter, or that excuses the homicide altogether upon the ground of self-defense.

**4. Same—**

When defendant rebuts the presumption of malice only, the presumption that the killing was unlawful remains, making the crime manslaughter.

**5. Homicide § 9—**

Upon the plea of self-defense, defendant must satisfy the jury (1) that he acted in self-defense, and (2) that in so acting he used no more force than reasonably appeared necessary under the circumstances to protect himself from death or great bodily harm.

**6. Homicide § 6—**

The killing of a human being under the influence of passion or in the heat of blood produced by adequate provocation constitutes manslaughter.

**7. Homicide § 21—**

Evidence in this case *held* sufficient to be submitted to the jury on the question of defendant's guilt of manslaughter.

**8. Criminal Law § 158—**

Where the charge of the court is not in the record, it will be presumed that the court correctly instructed the jury as to the law arising upon the evidence.

APPEAL by defendant from *Peel, J.,* September 1967 Session of WASHINGTON.

Prosecution on an indictment charging defendant on 20 May 1967 with the murder of James Henry Sanders.

Plea: Not guilty. After the jury was selected and empaneled, but before any evidence was introduced, the solicitor for the State announced that he would not ask for a verdict of guilty of murder in the first degree, but that he would ask for a verdict of guilty of murder in the second degree or guilty of manslaughter as the evidence might show. Verdict: Guilty of the felony and crime of manslaughter.

From a judgment of imprisonment, defendant appeals.

*Attorney General T. W. Bruton, Assistant Attorney General George A. Goodwyn, and Assistant Attorney General William W. Melvin for the State.*

*Pritchett, Cooke & Burch by Stephen R. Burch and Bailey & Bailey by Carl L. Bailey, Jr., for defendant appellant.*

PARKER, C.J.  Both the State and the defendant introduced evidence.

The sole assignment of error in defendant's brief is that the court committed error in denying his motion for a judgment of compulsory nonsuit at the close of all the evidence.

The evidence for the State tends to show the following facts: Defendant operated a house known as the Jungle on Sand Hill in the town of Plymouth. It was a rented four-room house with two bedrooms, a living room and a kitchen. He operated it as some kind of a night spot or a club.

On 20 May 1967 Robert Biggs was in this house slightly drunk and asleep. He was awakened by a gunshot and saw the defendant with a gun in his hand. When he looked up he saw defendant sitting on the end of a table opposite him. As soon as the firing ceased, Biggs started out of the house, and as he did so James Sanders backed up against him. Biggs saw no knife in James Sanders' hands. He does not know how far Sanders was from defendant, and he heard only two shots. When he left the house, he went to his home.

Peter J. McNair on this night was in a room adjoining the kitchen of defendant's house playing "skin" with about five people. There was a doorway between the two rooms but no door. He had seen James Sanders in the house that night. Sanders had had a drink, but he was not drunk. Defendant left the room where McNair was and went into the kitchen. Shortly after defendant went into the kitchen, McNair heard three shots. McNair started out of the room through the opening where the doorway was. He saw Sanders lying near the door. He did not see any knife or anything in Sanders' hands. He did not hear too much of an argument before the shots. He testified: "In a place like that you can't hardly tell whether you are hearing argument or not, piccolo playing, lot of noise going on." Defendant had played some cards with them that night, but he was not chipping the pot or charging so much a game. He arrived at this house about 11 o'clock that night. After he heard the shots, he went out through  the kitchen because he was interested in getting out of this house.

On 20 May 1967 Freeman Davenport went to the Jungle operated by defendant. When he arrived the boys were already playing cards, and he started in with them. He stayed several hours playing cards. He had nothing to drink. He was sitting with his back to the doorway. He heard some shots and saw Sanders fall. He saw no knife in Sanders' hands. He thinks he heard two shots. After he heard the shots and saw a man lying on the floor, he left and went home. Davenport testified: "I didn't look to see who was in there or

what happened. Yes, it was just a mad scramble, everybody trying to get out of there."

About 6 a.m. on 20 May 1967 Wallace Edward Craddock, a police officer of the town of Plymouth, was called to the hospital there to investigate the shooting of James Sanders. He went into the emergency room and saw James Sanders lying on the emergency table, stretched out. His clothes were off down to his waist. After seeing Sanders in the emergency room, he went outside and asked several people what had happened. At that time defendant was not there. Craddock went back into the hospital and when he came out about ten minutes later, defendant was in the lobby of the hospital. Craddock testified without objection in substance, except when quoted: He did not place defendant under arrest at that time. He said to defendant, "Hash, what happened?" Defendant said, "Well, I had to shoot at another one." They had a general conversation. The officer said, "Don't you know better? What happened?" Defendant said, "Well, I couldn't help it. You know I am kind of scarey and I do things like that." The officer said, "Where's the gun?" Defendant said, "Out here in the car. Come outside with me." Defendant went to his car parked near the hospital, opened the left-hand door, turned the back of the front seat down, and there was a pistol and a knife lying on the floor. Defendant picked them up and passed them to the officer and said, "Here's the gun I shot him with and here's a knife he was threatening me with." The officer said, "Well, you know I am going to have to charge you." Defendant said, "Well, I understand that. I reckon I can take care of it." The officer said, "Let's go down to the station, talk about it." Defendant asked him, "How's Sanders?" The officer replied, "I don't know really, I think in pretty bad shape. We will have to wait." Defendant said, "Can I wait with you?" The officer said, "Of course, come inside." They went inside and stood around talking. Dr. Stanton walked out and said, "He is dead." Defendant said, "My God." The officer said, "Hash, that makes it from assault to a murder charge." Defendant said, "I understand." The officer told defendant that he knew his rights and that he could call a lawyer or anybody he wanted to. Defendant got in the car with him. The officer let him stay in the station calling different people for twenty or thirty minutes before he put him in jail. During the conversation in the hospital, the officer told defendant that he did not have to tell him anything, that anything he said could be used against him, and defendant said, "I understand completely."

It was stipulated that Dr. A. M. Stanton, a physician and general surgeon practicing medicine in the town of Plymouth, was an expert physician specializing in the field of general surgery. He was on duty in the hospital when Sanders was brought in, and he exam-

ined the body. When Dr. Stanton first saw Sanders in the emergency room, he had no blood pressure or pulse and was almost dead. He had three bullet wounds — one in his left wrist about where one would wear a watch, another in the lower part of the abdomen in line with his navel, and another in his left thigh about an inch below the belt. In Dr. Stanton's opinion the bullet wound in the abdomen ruptured a large blood vessel, about the size of a thumb, which carries blood to the lower extremities, and this wound caused his death. The wound in the wrist looked like maybe a bullet had gone through the wrist into the abdomen. Sanders could have been shot twice.

Defendant's testimony in brief summary is as follows: On 20 May 1967 he rented a house on Sand Hill and operated it as a kind of night spot, a club like. There is a woods or swamp back of the place. The place was called the Jungle. He operated it for the benefit of people who did not have anywhere to go. On the night of 19 May 1967 and in the early morning of 20 May 1967 a number of people were in this house. There was a card game going on in the room adjacent to the kitchen. Defendant has known the deceased Sanders since he was a little boy. Defendant was about 11 year older than he was. Sanders was about half drunk when defendant saw him that night. Sanders had a general reputation as a dangerous and violent man when drinking. The first part of the night defendant was playing cards. He had occasion to go into the kitchen about 4:00 or 4:30 a.m. Hazel Barrow was in the kitchen cooking chickens. While defendant was in the kitchen, Sanders came up behind him playing and hit him on his back. He told Sanders, "Stop playing so much, when you're drunk you act like a little child." A little later he heard Sanders say, "M. F., I don't like you noway." He looked around and saw Sanders coming on him with a knife. Then Sanders said, "Another G. D. word, I am going to pull your head off." Defendant was back in the corner and saw Sanders coming toward him with a knife in his hand. He shot into the floor with a pistol he carried hanging out of his hip pocket for protection. After this shot it seemed like Sanders was coming on a little faster, and he shot at him three or four more times hitting him in the hand and in the stomach. He was afraid of Sanders and knew if he got to him with that knife he would cut him. He shot him in order to defend himself. After he shot him the last time, Sanders looked at him, kind of half-way laughed, turned around, walked back to the door, fell across two chairs, and then rolled over on the floor. After the shooting Sanders was carried to the hospital. On cross-examination defendant testified in substance: He ran this place to make some money. He sold

ABC whiskey, and he had a chicken cook-out every Friday night. He had the loaded pistol on him for protection. He had shot a man thirty days before with this pistol in this same house. He paid a fine of $50 for shooting a boy who had a hawk bill knife around his son. Sanders never got close enough to cut him. He was in a corner and he shot Sanders before he could get close enough to cut him. Sanders was a larger man than defendant.

Curtis Davis, Jr., was in the house on the morning of 20 May 1967. His foot was broken and it was in a cast. He was a partner of defendant in the operation of the business. He testified as a witness for defendant substantially corroborating the defendant. Hazel Barrow, who was a cook for defendant in the place and a partner in the operation of the house, testified for him in substantial corroboration of defendant's testimony.

Benjamin F. Biggs testified in rebuttal as a State's witness that "Hazel said, that I was to the stove cooking. She actually didn't see exactly what happened, when we talked, she didn't see no knife at that time."

Viola Hyman testified in rebuttal as a State's witness in substance, except when quoted: She saw Hazel Barrow before Sanders' funeral. She asked Hazel how it happened. She testified: "She told me, said that Buck and Hash was in the kitchen and they had some words together. Anyway said she was standing to the stove cooking. I asked, 'Did Buck say anything to Hash?' She said they had a few words. She said she was standing to the cook stove cooking. I asked, 'Did Buck draw a knife on Hash?' She said she didn't see any knife but said she was cooking chicken at the time."

Phoebe Sanders, wife of James Henry Sanders, was also called in rebuttal by the State. She is a sister of Hazel Barrow. When she and her sister left the hospital, Hazel Barrow said, "Don't cry, I will explain everything." She testified: "I asked her, 'Hazel, what happened?' She said, 'Well, I didn't see anything. I had my back turned, cooking chicken.' Said, 'When I turned around, Hash had shot Buck. He fell across the chairs and fell in the floor.'" Later, Hazel Barrow went down and had a talk with defendant. Then she and her sister, Phoebe Sanders, had another conversation. Phoebe Sanders said, "Hazel, if he was not intending to kill him, why did he shoot him four times?" Hazel said, "No, he didn't shoot him four times, he shot him three times." Phoebe Sanders further testified: "Yes, I asked her at that time about a knife. She told me Buck did not have no knife until she came and talked to Theophilus. Yes, she goes with Theophilus, been going with him quite a while, about eight years, I guess."

Defendant called Geraldine Cooper, his wife, in rejoinder. She testified in substance: That she lives in Washington, North Carolina, and visited her husband in jail in Plymouth. She testified on cross-examination: "Yes, I knew he [defendant] was in partnership with Hazel out in this bootleg joint." She teaches school in Washington, North Carolina.

Defendant's contention is this: The State offered evidence tending to show that the killing was done with a deadly weapon, but it offered no evidence as to what occurred immediately prior to the shooting. Defendant offered evidence tending to show that the shooting and the killing were done in self-defense, which showing does not contradict the State's evidence but tends merely to explain or make clear the State's evidence; and, since the State has not rebutted defendant's evidence that the killing was in self-defense, his motion for judgment of nonsuit should have been sustained.

Defendant's statements to Officer Craddock offered by the State may tend to exculpate him, but that did not prevent the State from showing the facts concerning the homicide were different from what the defendant said about them, and the State's case does not rest entirely on such statements. *S. v. Glover,* 270 N.C. 319, 154 S.E. 2d 305; *S. v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39; *S. v. Phelps,* 242 N.C. 540, 89 S.E. 2d 132; *S. v. Simmons,* 240 N.C. 780, 83 S.E. 2d 904.

Considering the State's evidence in the light most favorable to it and giving it the benefit of every reasonable inference to be drawn therefrom (2 Strong, N. C. Index 2d, Criminal Law, § 104), it would permit, but not compel, a jury to find the following facts from the evidence beyond a reasonable doubt: (1) That the deceased Sanders had had no argument with defendant prior to the shooting, that he was not advancing on him prior to the shooting, and that he had made no threats against him and had no knife in his hands; and (2) that defendant intentionally shot Sanders at least twice with a loaded pistol that he had on his person, and that Sanders died as a proximate result of being shot by defendant. When the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot the deceased or the defendant admits that he intentionally shot the deceased, and thereby proximately caused his death, it raises two presumptions against him: (1) That the killing was unlawful, and (2) that it was done with malice. This constitutes the felony of murder in the second degree. *S. v. Gregory,* 203 N.C. 528, 166 S.E. 387; *S. v. Wagoner,* 249 N.C. 637, 107 S.E. 2d 83; *S. v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337; 2 Strong, N. C. Index, Homicide, § 13. The intentional use of a deadly weapon as a weapon,

when death proximately results from such use, gives rise to the presumptions. *S. v. Gordon*, 241 N.C. 356, 85 S.E. 2d 322; *S. v. Phillips, supra*. When the presumption from the intentional use of a deadly weapon obtains, the burden is upon defendant to show to the satisfaction of the jury the legal provocation that will rob the crime of malice and thus reduce it to manslaughter or that will excuse it altogether upon the grounds of self-defense. *S. v. Mangum, supra; S. v. McGirt*, 263 N.C. 527, 139 S.E. 2d 640; *S. v. Todd*, 264 N.C. 524, 142 S.E. 2d 154. When defendant rebuts the presumption of malice only, the presumption that the killing was unlawful remains, making the crime manslaughter. 2 Strong, N. C. Index, Homicide, § 13. It was incumbent upon defendant upon a plea of self-defense to satisfy the jury (1) that he did act in self-defense, and (2) that, in the exercise of his right to self-defense, he used no more force than was or reasonably appeared necessary under the circumstances to protect himself from death or great bodily harm. *S. v. McDonald*, 249 N.C. 419, 106 S.E. 2d 477. It is hornbook law that if excessive force or unnecessary violence is used in self-defense, the killing of the adversary is manslaughter at least. *S. v. Cox*, 153 N.C. 638, 69 S.E. 419; *S. v. Glenn*, 198 N.C. 79, 150 S.E. 663; *S. v. Terrell*, 212 N.C. 145, 193 S.E. 161; *S. v. Mosley*, 213 N.C. 304, 195 S.E. 830. The killing of a human being under the influence of passion or in the heat of blood produced by adequate provocation constitutes manslaughter. 2 Strong, N. C. Index, Homicide, § 6; 40 C.J.S., Homicide, § 42. The court properly overruled the motion for judgment of compulsory nonsuit.

The court's charge has not been brought forward in the record. Therefore, it is presumed that the jury was charged correctly as to the law arising upon the evidence, as required by G.S. 1-180. *S. v. Pinyatello*, 272 N.C. 312, 158 S.E. 2d 596; 3 Strong, N. C. Index 2d, Criminal Law, § 158.

The jury found the defendant guilty of manslaughter. The verdict was supported by the evidence since it would permit a jury to find beyond a reasonable doubt that defendant killed Sanders while under the influence of passion or in the heat of blood produced by adequate provocation; or that, if defendant was exercising his right to self-defense, he used more force in so doing than was or reasonably appeared necessary under the circumstances to protect himself from death or great bodily harm. The verdict supports the judgment.

The judgment below is

Affirmed.