### STATE v. DONALD LEROY PROPST.
(Filed 14 June 1968.)

**1. Criminal Law § 29—**

Ordinarily, it is for the court in its discretion to determine if the circumstances brought to its attention are sufficient to call for a formal inquiry to determine whether defendant has sufficient mental capacity to plead to the indictment and conduct a rational defense.

**2. Same—**

Whether defendant is able to plead to the indictment and conduct a rational defense should be determined prior to the trial of defendant for the crime charged in the indictment, and the practice of submitting to the jury an issue as to the present mental capacity of defendant simultaneously with the issue of his guilt or innocence of the offense charged is expressly disapproved by the Supreme Court.

**3. Criminal Law § 5—**

At the trial, in passing upon a defendant's plea of not guilty because legally insane when the alleged crime was committed, the test of mental responsibility is the capacity of defendant to distinguish between right and wrong at the time of and in respect to the matter under investigation.

**4. Criminal Law § 29—**

Upon defendant's arraignment to plead to the offense of murder in the first degree as charged in the indictment, the trial court had the duty to conduct a hearing into defendant's capacity to stand trial upon defense counsel's suggestion that defendant was incompetent to plead to the indictment or to assist counsel in his defense, when there had been previous findings upon medical expert testimony within the past year that defendant was without sufficient mental capacity to stand trial, and even though counsel stated that he had no evidence concerning defendant's mental condition since the last hearing thereon.

**5. Homicide § 14—**

Defendant's plea of not guilty puts in issue every essential element of the crime of first degree murder, and the State must satisfy the jury from the evidence beyond a reasonable doubt that defendant unlawfully killed the deceased with malice and in execution of an actual, specific intent to kill formed after premeditation and deliberation.

**6. Same—**

When the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot the deceased with a pistol and thereby proximately caused his death, there arise the presumptions that the killing was (1) unlawful and (2) with malice, constituting the offense of murder in the second degree.

**7. Same—**

The presumptions arising from a killing proximately caused by the intentional use of a deadly weapon does not relieve the State of the burden to establish beyond a reasonable doubt the additional elements of premeditation and deliberation which are necessary to constitute murder in the first degree.

**8. Same; Homicide § 4—**

A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first degree murder, and the intentional

use of a deadly weapon as a weapon is necessary to give rise to presumptions of unlawfulness and of malice.

**9. Criminal Law § 6—**

It is well settled that voluntary drunkenness is not a legal excuse for crime; but where a specific intent, or premeditation and deliberation, is essential to constitute a crime or a degree of a crime, the fact of intoxication may negative its existence.

**10. Homicide § 25—**

Although evidence of defendant's intoxication in this prosecution for first degree murder was insufficient to support a jury finding that defendant was utterly unable to form a specific intent to kill after premeditation and deliberation or to form a specific intent to shoot the deceased with a deadly weapon, there was sufficient evidence of defendant's intoxication to warrant its submission to the jury for their consideration, and the trial court's failure to refer to such evidence and apply the law thereto is prejudicial.

APPEAL by defendant from *Campbell, J.,* May 30, 1967 Session of BURKE.

At March Session 1966, defendant was indicted for the first degree murder of Ralph Henderson Taylor on February 21, 1966.

On March 10, 1966, on motion of Simpson and Simpson, defendant's court-appointed counsel, Judge Froneberger entered an order transferring defendant to the Dorothea Dix Hospital in Raleigh, N. C., "for observation, study and examination in order that reports as to his mental condition might be obtained."

On May 3, 1966, a report from said hospital, signed by Dr. Walter A. Sikes, Superintendent, after "Clinical Notes," concluded: "The Medical Staff made the following diagnosis and recommendations: *Diagnosis:* Paranoid state. *Recommendations:* (1) Donald Propst is unable to plead to the bill of indictment and he is unable to understand the charges against him. (2) Donald Propst should be committed to the Dorothea Dix Hospital under the provisions of G.S. 122-91 and G.S. 122-83." (Note: The report identified defendant as a "29 year old white divorced male" who "customarily weighed around 400 or over pounds," and was unable to "maintain any type of regular employment due to his size," and who had been "financially sustained by his brother, Frank, over the last 8 or 10 years.")

On October 10, 1966, a second report from said hospital, signed by Dr. A. L. Laczko, Director of Criminal Unit, after "Clinical Notes," concluded: "The Medical Staff made the following diagnosis and recommendations. *Diagnosis:* Without Psychosis (Not Insane). *Recommendations:* (1) Donald Propst is able to plead to the Bill of Indictment and he is able to understand the charges against him. (2) Donald Propst does know the difference between right and wrong. (3) Return to Court."

The case was calendared for trial at the November 1966 Session. On Monday, November 21, 1966, the first day of said two-week session, defendant's counsel moved that the case be removed to another county for trial, or that a special venire of jurors from another county be ordered. The record is silent as to rulings, if any, with reference to these motions.

On November 28, 1966, according to the agreed case on appeal, "after six jurors were selected," defendant's counsel made a motion under G.S. 122-84 "that a determination be made by the Court concerning the capacity of the defendant to stand trial," and that "a hearing was held for this purpose" by Judge Clarkson, the presiding judge. Dr. Walter A. Sikes, Dr. James T. Nunnally, III, Dr. Andrew Laczko, and Dr. Archie M. Rayburn, testified at said hearing.

After hearing said testimony, Judge Clarkson entered an order which, after recitals, concluded as follows:

"After hearing the testimony, as appears in the record, the Court was of the opinion that Defendant was not, because of his mental condition, able to stand trial at this time; and therefore, the Court in accordance with the provisions of General Statutes 122-34 (sic) found that the Defendant was without sufficient mental capacity to undertake his defense or to receive sentence after conviction.

"AT THIS TIME IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the case be continued and further that the Defendant be sent back to Dorothea Dix Hospital, taken by the Sheriff of Burke County, for further observation and treatment; a copy of this Order to accompany this Defendant to Dorothea Dix Hospital in Raleigh; and that authorities of said hospital shall report to the Superior Court of Burke County at what time in the future it is the opinion of the Superintendent and the medical staff that the Defendant does have sufficient mental capacity to undertake his defense.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the testimony taken before the Court in this inquiry be transcribed by the Court Reporter and the transcript filed with the court papers in this case; the transcript to be at the expense of Burke County."

On February 14, 1967, a third report from said hospital, signed by Dr. A. L. Laczko, Director of Criminal Unit, after "Clinical Notes," concluded: "The Medical Staff made the following diagnosis and recommendations. *Diagnosis:* Without Psychosis (Not Insane). *Recommendations:* (1) Mr. Donald LeRoy Propst is able to plead to the Bill of Indictment and he is able to understand the charges against him. (2) Mr. Donald LeRoy Propst does know the difference between right and wrong. (3) Return to Court."

According to the case on appeal, "defendant was returned for trial at the June 1967 Term of Burke County Superior Court"; that,

STATE *v.* PROPST.

"when asked how he pleaded," defendant's counsel informed the court "he did not feel the defendant is competent at the present time to plead to a bill of indictment, nor to assist counsel in preparing the defense of this case." Defendant's counsel tendered to the court a transcript (now on file in this Court) of the testimony of said doctors taken before Judge Clarkson on November 21, 1966. The case on appeal states: "The defendant then, through his counsel, entered a plea of not guilty; attorneys for the defendant then objected to an arraignment on the basis of incompetency of the defendant to stand trial, and to plead to the bill and to assist counsel in the defense of his case. Upon inquiry by the Court, counsel for defendant informed the Court that defendant's plea of the offense charged was not guilty, by reason of incompetency at the present time, and not guilty on grounds of insanity at the time of charging the defendant with the murder of Ralph Henderson Taylor."

After reciting the facts substantially as stated above, Judge Campbell, the presiding judge, "then called upon counsel for the defendant to submit any evidence that the defendant had as to anything that transpired since February 14, 1967, pertaining to the defendant's mental condition." Defendant's counsel announced "that he had nothing that had transpired since February 14, 1967, concerning the defendant's mental condition." Thereupon, according to the record, the court proceeded with the selection of jurors.

After the jury was selected, sworn and impaneled, the court proceeded with the trial of defendant for murder as charged in the indictment.

Evidence was offered by the State and *in behalf* of defendant.

Uncontroverted evidence tends to show: On February 21, 1966, and prior thereto, defendant (Donald), twenty-nine, and his brother, Frank, forty-two, lived in a trailer, by themselves, "several miles" from the Taylor Hosiery Mill, owned by Ralph Henderson Taylor, where Frank was employed. Taylor died from wounds inflicted by bullets from a .38-caliber pistol fired by defendant.

The State offered three witnesses. Dr. John C. Reece testified Taylor's death was caused by described bullet wounds. Charlie Polk and J. D. Hoyle, employees of said hosiery mill, testified in substance, except where quoted, as set out below.

CHARLIE POLK: On February 21, 1966, about 3:00 p.m., the door of the plant "was slammed open" and defendant came in, hollering, "Hey, Ralph; where is Ralph?" and "Where is Ralph Taylor, the s.o.b. . . . I come to kill him." Defendant "hauled loose" and hit Polk, saying, "Don't you go for a knife," and "(i)f you do, you s.o.b., I'll kill you." Polk, saying he had no knife, struck defendant and "staggered him back." At that time, Taylor came through the

office door into the plant and said, "Donald, we can't have that go-- ing on here; you will have to get out of my place of business." De- fendant shoved Taylor into the tool room. Two shots were fired. J. D. Hoyle was in the tool room. Taylor was "lying there" in the tool room with a machine hammer near his head. Frank (who had entered the mill with Donald) came and looked into the tool room. Defend- ant and Frank Propst were "laughing as they went out of the door."

J. D. HOYLE: Hoyle was in the tool room. He first saw defend- ant when defendant was passing the tool room door. When he next saw defendant, defendant had a gun in his hand. Taylor, in the tool room, was facing the door. He was two or three feet from defendant. Two shots were fired. He saw Taylor's right arm or hand, apparently with an object in it, "come down on the gun" about the time the first shot was fired. After the shots were fired, a hammer was near Taylor's body. After the second shot, Frank stuck his head into the door and said, "Oh, no, Ralph," or something to that effect. He "did not hear (Frank) laugh." His hearing is impaired "about 50 per cent."

Defendant did not testify. Frank Propst, Wade McGalliard, Dr. Walter A. Sikes and Dr. James T. Nunnally, III, were offered as witnesses for defendant.

With reference to what occurred immediately prior to the shoot- ing, Frank Propst testified as follows:

"Instead of going to the laundry Donald stopped at Ralph's hos- iery mill. I said to him don't go in there; he said I'm going in to see Charlie. When Donald went in the hosiery mill, I was four or five feet behind him; J. D. was in the tool room and I spoke to him; Donald went on down to where Charlie Polk was. I seen Donald slap Charlie; Ralph came out and I said Ralph, Donald is drunk, and Ralph said I don't give a damn what he is; and he grabbed Donald and Donald shoved Ralph; whenever Ralph staggered, he caught his footing again and ran into the tool room and went inside; Donald went up there close to the tool room door; I was within two or three feet of Donald and the door then; I was standing directly at the tool room door and Donald was just a little ways on the other side.

"I seen Ralph turn from his tool box with the hammer in his hand; Ralph came back to the door and I heard Donald say: Ralph, put that hammer down; and at that time when Donald first seen the hammer, Donald had the gun out. Ralph stood there in the entrance to the tool room door and kind of looked around and when he done that, he came down with the hammer onto Donald's right hand and I heard a shot. I heard two shots. After the first shot, there was an- other. Ralph hit Donald on the hand with the hammer; he hit

Donald's right hand between the thumb and forefinger and that is when I heard the first shot. I later observed Donald's hand and it had a black spot between the thumb and forefinger. After the shots, I looked into the tool room and said, 'Oh, God, no, Ralph.' Donald said come on, Frank, let's go; and we left. Donald went out the door first and I was second.

"Donald went out to the truck; we backed out into the highway and went down by Curley's Fish Camp and went back to the trailer. There was no laughter; I didn't laugh and Donald didn't laugh. Donald drove on back to the trailer."

With reference to defendant's actions on February 21, 1966, prior to defendant's arrival at the hosiery mill about 3:00 p.m., Frank Propst testified in substance, except where quoted, as narrated below.

Frank and Donald got up "between 9:00 and 10:00 o'clock" and went over to the hosiery mill (at Hildebran) and got Frank's check. After getting the check cashed, they went to Smith's Barbecue in Longview and ate breakfast. After breakfast, they got some groceries and took them to their trailer-home. Afterwards, en route to Newton, they "stopped at a whiskey store and bought one fifth of whiskey down at Sky City." The whiskey was opened and Donald "drank some of it, . . . about an inch or so." Leaving the whiskey store, they went to Newton where they paid a bill at a cold storage plant. While in Newton, Donald drank "some" of the whiskey. Upon their return to their trailer-home, Donald drank "the rest of the whiskey" — "practically all of the fifth" — "all of the whiskey except about one inch that is still in the bottle" — "before going to the laundry." Frank drank none of the whiskey. Instead of going to the laundry, defendant stopped at the hosiery mill.

Frank did not have a driver's license. In going from place to place as set out in the preceding paragraph, defendant was driving his truck. "He had difficulty with his driving that morning; he acted like he didn't know where we were going, although we had lived around Newton for awhile and Donald had been to the cold storage place about 15 times. . . . Donald had difficulty finding his way back home; he made several wrong turns on the way and I (Frank) had to tell him which way to go. . . . He (Donald) acted like he was awfully nervous and he took a great big drink of it; he had really been tore up for the past several days; a bad case of nerves. He took a box of aspirin between the time we got up and the time we left to go to Newton. He was complaining with his head."

Wade McGalliard, a deputy sheriff, testified in substance, except where quoted, as follows: He arrested defendant at his trailer home about 3:30 p.m. He located the hammer. There was a bruise or grease

spot on the section of defendant's hand between his thumb and index finger on his right hand. He "didn't smell anything unusual" about defendant. About 7:35 p.m., at the sheriff's office, Frank stated "he saw Taylor when he hit Donald's hand which held the gun and that the gun fired," and that "Taylor grabbed his side and that Donald fired again." Frank identified the pistol as belonging to defendant and said defendant "had beat him badly on several occasions."

Dr. Sikes testified in his opinion defendant "did not know on February 21, 1966, the difference between right and wrong." He testified: "It is my opinion that the defendant is suffering from schizophrenic reaction chronic undifferentiated type. In laymen's words, he has lost contact with reality and has false ideas; they have difficulty distinguishing between what is real and what is not real; they at times hear voices and people talking to them that are not there; they develop ideas that are of various nature; people are against them; they have unusual powers. They are being persecuted."

Dr. Nunnally gave testimony relating to defendant's mental condition on February 21, 1966, and on May 3, 1966.

The jury returned a verdict of guilty of murder in the first degree with a recommendation of life imprisonment; and judgment that defendant be confined in the State's Prison for the term of his natural life was pronounced.

Defendant excepted and appealed.

*Attorney General Bruton and Deputy Attorney General Moody for the State.*

*Simpson & Simpson for defendant appellant.*

BOBBITT, J. Ordinarily, it is for the court, in its discretion, to determine whether the circumstances brought to its attention are sufficient to call for a formal inquiry to determine whether defendant has sufficient mental capacity to plead to the indictment and conduct a rational defense. *State v. Sullivan,* 229 N.C. 251, 258, 49 S.E. 2d 458, 462; *State v. Khoury,* 149 N.C. 454, 62 S.E. 638; 21 Am. Jur. 2d, Criminal Law § 65. See Annotation, "Investigation of present sanity to determine whether accused should be put, or continue, on trial," 142 A.L.R. 961, at 972-992.

At November 1966 Session, the conflicting diagnoses and recommendations in the hospital reports of May 3, 1966, and of October 10, 1966, were amply sufficient to justify Judge Clarkson's decision to conduct a formal inquiry to determine whether defendant had sufficient mental capacity to plead to the indictment and conduct a rational defense. In *State v. Sullivan, supra,* where our prior cases are reviewed, it was held that, by virtue of the statutes now codified

as G.S. 122-83 and G.S. 122-84, such determination may be made by the court with or without the aid of a jury. Judge Clarkson heard the evidence, made his findings of fact and entered his order of November 29, 1966.

Subsequently, the report of February 14, 1967, signed by Dr. Laczko, was made. The "Clinical Notes," diagnosis and recommendations set forth therein, which relate to defendant's condition as of February 14, 1967, are in all material respects the same as those set forth in the report of October 10, 1966, relating to defendant's condition as of October 10, 1966. Although at May 30, 1967 Session defendant's counsel stated "he had nothing that had transpired since February 14, 1967, concerning the defendant's mental condition," we are of opinion, and so decide, that the report of May 3, 1966, made by Dr. Sikes, and the testimony of Dr. Sikes at the hearing before Judge Clarkson at November 1966 Session, and Judge Clarkson's findings of fact on November 29, 1966, made it necessary that a further hearing be conducted at or prior to the May 30, 1967 Session to determine whether defendant then had sufficient mental capacity to plead to the indictment and conduct a rational defense before defendant could be placed on trial for murder as charged in the indictment. So far as the record discloses, no further hearing was conducted and no findings of fact or determinations were made in respect of defendant's mental capacity.

Whether defendant is able to plead to the indictment and conduct a rational defense should be determined prior to the trial of defendant for the crime charged in the indictment. In *State v. Haywood*, 94 N.C. 847, at 854, Smith, C.J., states: "(T)he defendant's capacity to enter upon a trial, should be determined before he is put upon the trial; for the trial would amount to nothing if the defendant has not the required capacity to defend himself against the charge. The very requirement to answer, prejudges the case adversely to the prisoner, and must have an unfavorable influence upon the jury, in passing upon the issue. Besides, the blending of the inquiries, by allowing evidence pertinent to one, and incompetent to the other, notwithstanding the caution the Judge may give as to its consideration, may tend to confuse the minds of the jury, and to do injustice to the defendant." Although this Court, in *State v. Haywood, supra,* in *State v. Sandlin,* 156 N.C. 624, 72 S.E. 203, and in *State v. Sullivan, supra,* held permissible the submission of an issue as to a defendant's present mental capacity to plead to the indictment and to conduct a rational defense simultaneously with an issue as to whether defendant is guilty or not guilty of the crime charged in the indictment, this procedure is not approved. See 30 N.C.L.R. 4, 20-21, and 27 N.C.L.R. 258.

"In determining a defendant's capacity to stand trial, the test is whether he has the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to co-operate with his counsel to the end that any available defense may be interposed." 21 Am. Jur. 2d, Criminal Law § 63. This is in accord with *State v. Harris,* 53 N.C. 136, where it was determined that the defendant, a deaf-mute, could not be put on trial for the murder charged in the indictment. The basis of decision, as stated by Battle, J., was that "a deaf and ,dumb prisoner, whose faculties have not been improved by the arts of education, and who, in consequence thereof, cannot be made to understand the nature and incidents of a trial, ought not to be compelled to go through, what must be to him, the senseless forms of such a trial." At trial, in passing upon a defendant's plea of not guilty because legally insane when the alleged crime was committed, "(t)he test of mental responsibility is the capacity of defendant to distinguish between right and wrong at the time of and in respect to the matter under investigation." 2 Strong, N. C. Index 2d, Criminal Law § 5; *State v. Spence,* 271 N.C. 23, 38, 155 S.E. 2d 802, 813.

Although for the reasons stated, the verdict and judgment must be vacated and the cause remanded for further proceedings, it seems appropriate to consider an assignment of error relating to the trial itself.

The court instructed the jury as to the law applicable to the asserted defense that defendant was legally insane when the alleged crime was committed.

In charging the jury, the court did not state any of the evidence bearing upon whether defendant was intoxicated on February 21, 1966, when the shooting occurred, and did not state any contention of defendant or give any instruction relating to the evidence as to defendant's intoxication. Defendant assigns as error this asserted deficiency in the charge.

In order to convict of *murder in the first degree,* the State was required to satisfy the jury from the evidence beyond a reasonable doubt that defendant unlawfully killed Taylor with malice, and that he did so in execution of *an actual, specific intent to kill, formed after premeditation and deliberation.* The plea of not guilty put in issue every essential element of the crime of first degree murder. *State v. Jackson,* 270 N.C. 773, 155 S.E. 2d 236, and cases cited.

If and when the State satisfied the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot Taylor with a .38 pistol and thereby proximately caused Taylor's death,

two presumptions arose: (1) that the killing was unlawful, and (2) that it was done with malice. Nothing else appearing, the defendant would be guilty of murder in the second degree. *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322; *State v. Adams,* 241 N.C. 559, 85 S.E. 2d 918; *State v. Wagoner,* 249 N.C. 637, 107 S.E. 2d 83; *State v. Revis,* 253 N.C. 50, 116 S.E. 2d 171; *State v. Phillips,* 264 N.C. 508, 515, 142 S.E. 2d 337, 340; *State v. Price,* 271 N.C. 521, 525, 157 S.E. 2d 127, 129-130; *State v. Cooper,* 273 N.C. 51, 57, 159 S.E. 2d 305, 309. "The presumptions do not arise if an instrument, which is *per se* or may be a deadly weapon, is not intentionally used as a weapon, *e.g.,* from an accidental discharge of a shotgun." *State v. Gordon, supra.* The additional elements of premeditation and deliberation, necessary to constitute murder in the first degree, must be established beyond a reasonable doubt, and found by the jury, before the verdict of guilty of murder in the first degree can be returned; and the burden of so establishing these additional elements of premeditation and deliberation rests and remains on the State. *State v. Miller,* 197 N.C. 445, 448, 149 S.E. 590, 592; *State v. Payne,* 213 N.C. 719, 729, 197 S.E. 573, 579; *State v. Bowser,* 214 N.C. 249, 253, 199 S.E. 31, 33; *State v. Hawkins,* 214 N.C. 326, 334, 199 S.E. 284, 289; *State v. Chavis,* 231 N.C. 307, 311, 56 S.E. 2d 678, 681; *State v. Lamm,* 232 N.C. 402, 406, 61 S.E. 2d 188, 190; *State v. Faust,* 254 N.C. 101, 106, 118 S.E. 2d 769, 772.

A *specific intent to kill* is a necessary constituent of the elements of premeditation and deliberation in first degree murder, and the intentional use of a deadly weapon as a weapon is necessary to give rise to said presumptions of unlawfulness and of malice. *State v. Gordon, supra.*

It is well settled that voluntary drunkenness is not a legal excuse for crime. In *State v. Murphy,* 157 N.C. 614, 72 S.E. 1075, Hoke, J. (later C.J.), states: "The principle, however, is not allowed to prevail where, in addition to the overt act, it is required that a definite specific intent be established as an essential feature of the crime. In Clark's Criminal Law, p. 72, this limitation on the more general principle is thus succinctly stated: 'Where a specific intent is essential to constitute crime, the fact of intoxication may negative its existence.' Accordingly, since the statute (now codified as G.S. 14-17) dividing the crime of murder into two degrees and in cases where it becomes necessary, in order to convict an offender of murder in the first degree, to establish that the 'killing was deliberate and premeditated,' these terms contain, as an essential element of the crime of murder, 'a purpose to kill previously formed after weighing the matter' (*S. v. Banks,* 143 N.C. 658; *S. v. Dowden,* 118 N.C.

1148), a mental process, embodying a specific, definite intent, and if it be shown that an offender, charged with such crime, is so drunk that he is utterly unable to form or entertain this essential purpose he should not be convicted of the higher offense." Later decisions in accord include the following: *State v. English,* 164 N.C. 497, 511, 80 S.E. 72, 77; *State v. Foster,* 172 N.C. 960, 965-966, 90 S.E. 785, 788; *State v. Hammonds,* 216 N.C. 67, 3 S.E. 2d 439; *State v. McManus,* 217 N.C. 445, 8 S.E. 2d 251; *State v. Cureton,* 218 N.C. 491, 495, 11 S.E. 2d 469, 471. Also, see dissenting opinion of Barnhill, J., (later C.J.) in *State v. Creech,* 229 N.C. 662, 675, 51 S.E. 2d 348, 358.

As stated by Walker, J., in *State v. Foster, supra:* "(W)here a specific intent is essential to the criminality of the act, or there must be premeditation or deliberation, or some mental process of the kind in order to determine the degree of the crime, it is proper to consider the prisoner's mental condition at the time the alleged offense was committed."

Decisions in other jurisdictions relating to intoxication as a defense to a "specific intent crime" are collected and reviewed in Annotation, "Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge," 8 A.L.R. 3d 1236, at 1246-1262.

The evidence most favorable to defendant tended to show he was looking for Polk when he entered the hosiery mill; that he found Polk and slapped him; that Taylor intervened, grabbed defendant and ordered him to leave; that Taylor got a machine hammer and was advancing on defendant; and that the first shot occurred when Taylor was striking defendant with the hammer.

In our view, the evidence as to defendant's intoxication is insufficient to support a finding that he was so drunk that he was *utterly unable* to form an actual, specific intent to kill, after premeditation and deliberation, and was insufficient to support a finding that defendant was *utterly unable* to form a specific intent to shoot Taylor. Even so, when considered in connection with the testimony referred to in the preceding paragraph, and in connection with the testimony as to defendant's mental status and nervous condition, we think the testimony relating to his intoxication was competent *for consideration* as bearing upon whether the State had satisfied the jury from the evidence beyond a reasonable doubt that defendant had unlawfully killed Taylor in the execution of *an actual, specific intent to kill, formed after premeditation and deliberation,* and for consideration as bearing upon whether the State has satisfied the jury from the evidence beyond a reasonable doubt that defendant *intentionally* shot Taylor and thereby proximately caused his death. In our view, the court, in charging the jury, should have

referred to the evidence relating to defendant's intoxication and should have given instructions as to how it should be considered.

Although other assignments of error present serious questions, it is improbable they will recur at another trial. Discussion thereof in the context of the record now before us is unnecessary and inappropriate.

Error and remanded.