STATE OF NORTH CAROLINA v. WINFRED ALLEN RUMMAGE

No. 66

(Filed 15 December 1971)

1. **Homicide § 28— self-defense — instructions — reputation of deceased as violent man**

   In this homicide prosecution in which there was plenary evidence that deceased was a dangerous and violent man when he was intoxicated and that he was intoxicated at the time he was fatally shot, the trial court erred in failing to charge as to the bearing the reputation of deceased as a violent man might have had on defendant's reasonable apprehension of death or great bodily harm at the time deceased allegedly attacked or threatened to attack defendant.

2. **Homicide § 6— involuntary manslaughter**

   Involuntary manslaughter is the unintentional killing of a human being without malice, premeditation or deliberation which results from the performance of an unlawful act not amounting to a felony, or not dangerous to human life; or from the performance of a lawful act in a culpably negligent way; or from the culpable omission to perform some legal duty.

3. **Homicide § 6— voluntary manslaughter**

   Voluntary manslaughter is the unlawful killing of a human being without malice, premeditation or deliberation.

4. **Homicide § 27— instructions on manslaughter — intentional killing**

   The trial court did not err in charging the jury that "Generally speaking, manslaughter is the *intentional* unlawful killing of a human being without malice, either express or implied, and without deliberation or premeditation."

5. **Homicide § 27— instructions on manslaughter — heat of passion**

   In its instructions on manslaughter, question posed by the court as to whether defendant killed deceased in the heat of passion was inappropriate where there was no evidence that defendant killed deceased in the heat of passion.

6. **Homicide § 27— instructions — excessive force in self-defense — manslaughter**

   In this homicide prosecution, the court's instructions did not give defendant the benefit of the possibility that second degree murder might be mitigated to manslaughter by reason of the use of excessive force while acting in self-defense.

7. **Homicide § 14— intentional killing with a deadly weapon — presumptions**

   When the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot a human being with a deadly weapon and thereby proximately caused his death, the presumptions arise that the killing was (1) unlawful and (2) with

malice; nothing else appearing, such person would be guilty of murder in the second degree.

**8. Homicide § 27— instructions on manslaughter — use of words "intentional killing"**

Where all the evidence in a homicide prosecution showed that deceased's death was proximately caused by defendant's intentional use of a deadly weapon, and defendant relied on the defense of self-defense, the court's frequent interchangeable use in the charge on manslaughter of the words "intentional killing" and "intentional shooting" bore too heavily against defendant by pointing to a finding of malice.

**9. Homicide § 23— instructions — failure to distinguish between second degree murder and manslaughter**

In this homicide prosecution, the trial court did not apply the law to the facts so as to distinguish clearly between second degree murder and manslaughter by questions which the court instructed the jury to consider in determining defendant's guilt or innocence of second degree murder or of manslaughter.

APPEAL by defendant from *Bowman, S.J.,* 1 March 1971 Session of STANLY Superior Court.

The evidence offered by the State and defendant tends to show that defendant operated an establishment known as "Snipes Place" which consisted of one room adjoining his living quarters in a four-room concrete block building. An outside door opened into the front room occupied by "Snipes Place," which room was approximately 11 feet wide. The room was divided by a concrete block bar some 3½ feet high and 7 feet long. There were benches lining the front portion of the room, and behind the bar were a drink box and cabinet. Defendant slept in a bedroom that opened into the area behind the bar.

On 19 January 1970, between 2:30 and 3:00 o'clock p.m., Noah Mabry (the deceased), Junior Almond and Jake Coley were in Snipes Place. Mabry and Coley were arguing, and Mabry was cursing Coley. Defendant came from his bedroom into the passage area between the end of the bar and the wall, and told Mabry that he was "not going to have this mess going on in here." He ordered Mabry to sit down and took a wooden stick and pushed Mabry in the abdomen. Defendant reached into a cabinet, obtained a pistol, and put it in his hip pocket. Mabry sat down on the bench by the wall, but immediately arose and moved towards defendant, stating that he would knock hell of defendant. Mabry had his right hand in his pocket, and when

he was within four or five feet of defendant, who was still standing at the end of the bar, defendant shot Mabry one time in the upper chest with a .25 caliber pistol. Mabry died instantly.

Defendant testified that he had sent Mabry away from his place earlier in the day and at that time Mabry had stated, "Well, I'm going. I'm coming back and I will have a gun." Defendant further testified that he had known Mabry for ten or twelve years and that when he was drinking he was a dangerous man. He stated that on 19 January 1971 Mabry had been drinking. He also related that three days earlier Mabry had shot a .22 caliber pistol at defendant's feet and had on another occasion pulled a knife on defendant at his place of business. He thought that Mabry had a gun at the time he was shot. Defendant stated that before he shot he had backed up as far as he could go and had warned Mabry to stop. He stated: "At the time I shot Noah, he was standing with his right hand in my face—just like he was going to grab me at any minute. His hand was within a foot of my face. Noah said, 'You are the god-damned son of a bitch that I am going to get.' He was mad, and I was scared of him . . . ."

Junior Pierce Almond, testifying for the State as to the events immediately before the shooting, stated: "After Noah sat down, he sprang back up. He jumped up real fast. Noah was saying something at this time, I don't recall what he was saying. I couldn't understand it. . . . Noah Mabry was in the process of walking at the time when he was shot. He got within three or four feet from Wink at the time he was shot. He was walking toward Winfred Rummage when he was shot. At the time he was shot, he had stopped. He was reaching out for Wink Rummage with his left arm. He pulled his right hand out of his pocket and pulled back his right hand. At the time Noah Mabry was shot, Noah Mabry had his left hand out just in front of Wink Rummage's face and he had his right hand pulled back behind his body."

The deputy sheriff who investigated the killing found two penknives and some 35 rounds of .22 caliber ammunition on Noah Mabry's body. Neither of the knives was open.

The jury returned a verdict of guilty of murder in the second degree, and the trial judge imposed a prison sentence of not less than twenty years nor more than twenty-five years. Defendant appealed.

This case is transferred for initial appellate review by the Supreme Court under an order entered pursuant to G.S. 7A-31(b)(4).

*Attorney General Morgan and Assistant Attorney General Chalmers for the State.*

*Coble, Morton & Grigg, by Ernest H. Morton, Jr., for defendant.*

BRANCH, Justice.

Defendant contends that the trial judge erred by failing to apply evidence offered as to deceased's violent character to the question of defendant's reasonable apprehension of death or great bodily harm from the alleged attack by deceased.

This question was considered by the Court in the case of *State v. Riddle,* 228 N.C. 251, 45 S.E. 2d 366. There defendant introduced evidence that deceased was a man of violent character, and the trial judge, in his charge, failed to explain the effect that such reputation might have upon defendant's reasonable apprehension of death from the attack, to which his evidence pointed. Before the formal charge to the jury and during the trial, the trial judge stated:

> "Gentlemen of the jury, yesterday the defendants in this case offered evidence tending to show that the deceased man, Andrew Hoyle, was a man of dangerous and violent character. Where defense interposed is that of self-defense, such evidence is competent. Evidence of the general reputation of the deceased is not competent or material in the case, but as the Court has stated, where the defendant interposed his self-defense, then it is proper to show that the deceased was a man of dangerous and violent character."

This Court held that the failure to charge on the violent character of deceased resulted in prejudicial error notwithstanding the absence of a request for special instructions.

[1] In instant case there was plenary evidence that deceased was a dangerous and violent man when he was intoxicated. There was also evidence that he was intoxicated at the time he was fatally shot. The trial judge failed to charge as to the bearing the reputation of deceased as a violent man might have had on

defendant's reasonable apprehension of death or great bodily harm at the time deceased allegedly attacked or threatened to attack defendant. This was error.

Nevertheless, we are reluctant to hold that this error, standing alone, constituted reversible error, since the trial judge had otherwise fully charged on self-defense. We therefore consider other portions of the charge which defendant assigns as error.

Defendant's Assignment of Error No. 4 is that "The court erred in charging the jury that voluntary manslaughter was an intentional killing . . . ."

[2]  Involuntary manslaughter is the unintentional killing of a human being without malice, premeditation or deliberation, which results from the performance of an unlawful act not amounting to a felony, or not naturally dangerous to human life; or from the performance of a lawful act in a culpably negligent way; or from the culpable omission to perform some legal duty. *State v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485; *State v. Satterfield,* 198 N.C. 682, 153 S.E. 155.

[3]  Voluntary manslaughter is the unlawful killing of a human being without malice, premeditation or deliberation. *State v. Wynn,* 278 N.C. 513, 180 S.E. 2d 135; *State v. Downey,* 253 N.C. 348, 117 S.E. 2d 39; *State v. Street,* 241 N.C. 689, 86 S.E. 2d 277.

Some confusion has arisen in this jurisdiction as to the definition of manslaughter because the court on occasion defines manslaughter without indicating whether it be voluntary manslaughter or involuntary manslaughter.

Defendant argues that voluntary manslaughter must be an unintentional killing. In support of this contention he cites and relies on *State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886. There the Court, *inter alia,* stated:

"Evidence of manslaughter is lacking. The crime is defined as the unlawful killing of a human being without malice, express or implied, without premeditation and deliberation, *and without the intention to kill or to inflict serious bodily injury. State v. Kea,* 256 N.C. 492, 124 S.E. 2d 174; *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889; *State v. Benge,* 272 N.C. 261, 158 S.E. 2d 70." (Emphasis ours.)

State v. Rummage

The quotation from *Roseboro* appears to define involuntary manslaughter. The authorities there cited do not purport to define voluntary manslaughter.

In *State v. Baldwin*, 152 N.C. 822, 68 S.E. 148, Hoke, J., speaking for the Court, stated:

> ". . . Manslaughter is the unlawful killing of another without malice, and, under given conditions, this crime may be established, though the killing has been both unlawful *and intentional.* Thus, if two men fight upon a sudden quarrel and on equal terms, at least at the outset, and in the progress of the fight one kills the other—kills in the anger naturally aroused by the combat—this ordinarily will be but manslaughter. In such case, though the killing may have been both unlawful and intentional, the passion, if aroused by provocation which the law deems adequate, is said to displace malice and is regarded as a mitigating circumstance reducing the degree of the crime." (Emphasis ours.)

[4] This Court has also recognized that under given circumstances a person may be justified in intentionally killing when he acts in self-defense. *State v. Kirby,* 273 N.C. 306, 160 S.E. 2d 24. Yet, such person may be guilty of voluntary manslaughter when an intentional killing results from excessive use of force while he is acting in self-defense. *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305; *State v. Wynn, supra.* It follows that under the circumstances of this case it was not error for the trial judge to charge that "Generally speaking, manslaughter is the intentional unlawful killing of a human being without malice, either express or implied, and without deliberation or premeditation."

[9] However, further examination of the charge reveals that the trial judge did not apply the law to the facts so as to clearly distinguish between manslaughter and second degree murder. In his final mandate to the jury the judge chose to use the vehicle of apparently standardized questions to meet the requirements of G.S. 1-180. In this connection the record shows that the judge charged:

> "Now, when you come to consider whether the defendant is quilty or innocent of the charge of murder in the second degree, I instruct you that you should ask these questions:

1. Did the deceased die as a result of any wound inflicted upon him by the defendant on or about the 19th day of January, 1971?

2. Did the defendant intentionally shoot and kill the deceased, Noah Mabry?

3. Did the defendant kill him intentionally and with malice?

4. Did he kill the deceased with a deadly weapon?

If you so find and are satisfied from the evidence and beyond a reasonable doubt, the burden being upon the State to so satisfy you, that the truth requires an affirmative answer to each, all, and every one of these four questions; that is, that all of these questions should be answered 'Yes,' then it would be your duty to convict the defendant of murder in the second degree and return that as your verdict, unless the defendant has established to your satisfaction from the evidence in this case—that is all the evidence in this case—either that offered by the State or that offered by the defendant, and has established to your satisfaction not beyond a reasonable doubt, not by the greater weight of the evidence, but only to your satisfaction the legal provocation which will take from the crime the element of malice and thus reduce it to manslaughter, or which will excuse it altogether on the grounds of self-defense, in which latter event, you will return a verdict of not guilty of second degree murder.

.  .  .  .

If and when you come to consider his guilt—that is, the defendant's guilt—or innocence to the charge of manslaughter, I instruct you that you should ask yourselves these questions:

1. Did the deceased die as a result of wounds inflicted upon him by the defendant on this occasion?

2. Did the defendant unlawfully and intentionally shoot and kill the deceased?

3. Did the defendant kill the deceased intentionally?

4. Did the defendant kill the deceased unlawfully in the heat of passion by reason of anger suddenly aroused and

before sufficient time had elapsed for passion to subside and reason to resume its control?

> If you find and are satisfied from the evidence and beyond a reasonable doubt, the burden being upon the State of North Carolina to so satisfy you, that the truth requires an affirmative answer to each, all, and every one of these four questions; that is to say that each of these questions should be answered 'Yes'—then it would be your duty to convict the defendant of manslaughter, unless he has established merely to the satisfaction of the jury the truth of the facts upon which he relies to make good his plea of self-defense, in which latter event, it would be your duty to acquit the defendant; or if you are not so satisfied of the defendant's guilt, it would be your duty to return a verdict of not guilty; or if you have a reasonable doubt as to the defendant's guilt, it would be your duty to give him the benefit of that reasonable doubt and to acquit him."

The judge had previously charged the jury:

> "When an intentional killing is admitted or established, the law presumes malice from the intentional use of a deadly weapon as such, and the defendant is guilty of murder in the second degree unless he can satisfy the jury of the truth of the facts which justify his acts or mitigate it to manslaughter."

The content of the questions posed as to second degree murder was identical with the first three questions presented as to manslaughter except for the words "without malice."

[5, 6] The fourth question stated concerning the charge of manslaughter was inappropriate, since there was no evidence that defendant killed deceased in "the heat of passion." Nor did the charge at this point give defendant the benefit of the possibility that the charge on second degree murder might be mitigated to manslaughter by reason of the use of excessive force while acting in self-defense.

[7] It is a well settled principle of law in this jurisdiction that when the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot a human being with a deadly weapon and thereby proximately caused his death, two presumptions arise: (1) that the killing was unlaw-

ful, and (2) that it was done with malice. Nothing else appearing, such person would be guilty of murder in the second degree. *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322.

> ". . . When the presumption from the intentional use of a deadly weapon obtains, the burden is upon defendant to show to the satisfaction of the jury the legal provocation that will rob the crime of malice and thus reduce it to manslaughter or that will excuse it altogether upon the grounds of self-defense." *State v. Cooper, supra.*

[8] All the evidence in this case shows that deceased's death was proximately caused by defendant's intentional use of a deadly weapon. Thus, the frequent interchangeable use in the charge on manslaughter of the words "intentional killing" and "intentional shooting" bore too heavily against defendant by pointing to a finding of malice.

[9] The content and form of the questions did not clearly apply the law to the facts, and the charge left the jury with no clear choice between second degree murder and manslaughter. This defect was not remedied by other portions of the charge.

The confusion of the jury as to the difference between manslaughter and second degree murder was evidenced by the fact that after 35 minutes of deliberation, the jury returned to the courtroom and the foreman of the jury stated to the court: "We'd like to know the difference between manslaughter and second degree murder again." Whereupon, the trial judge repeated the general definitions of manslaughter and second degree murder which he had previously given, without any further application of the law to the facts of the case.

The errors in the charge require a

New trial.