STATE OF NORTH CAROLINA v. GEORGE EDWARD WILLIAMS

No. 45

(Filed 17 December 1975)

1. **Homicide §§ 14, 24— presumption of malice and unlawfulness — burden of proof — instruction proper**

    The trial court's instruction in a first degree murder case on the presumptions of malice and unlawfulness arising upon proof of the intentional inflicting of a wound with a deadly weapon proximately causing death did not unconstitutionally relieve the State of its burden to prove beyond a reasonable doubt each and every element of the crime charged.

2. **Homicide § 26— second-degree murder — instructions proper**

    The trial court in a first degree murder prosecution did not err in instructing the jury that second-degree murder differs from first-degree murder in that neither specific intent to kill, premeditation, nor deliberation is necessary.

3. **Criminal Law § 48— silence of defendant — evidence inadmissible**

    The State could not offer defendant's silence in the course of a police officer's investigation as evidence of defendant's guilt or for the purpose of impeaching him as a witness; however, this evidence was of such insignificant probative value when compared with the overwhelming competent evidence of guilt that its admission did not contribute to defendant's conviction and therefore admission of the evidence was harmless error beyond a reasonable doubt.

4. **Criminal Law § 122— additional jury charge — expense caused by mistrial — no coercion of jury**

    An isolated portion of the trial court's additional charge to the jury which referred to the expense which would result to the State and County if no verdict were returned would not coerce or prejudice the mind of a juror of ordinary firmness and intelligence, particularly in light of the trial court's subsequent admonition to the jurors that the court did not intend to force or coerce the jury into reaching a verdict and that a juror should not reach a verdict which required him to surrender his conscientious convictions.

5. **Homicide § 20— pistol, bullets and fragments — chain of custody established — admissibility**

    The trial court in a first degree murder prosecution did not err in allowing into evidence the .22 pistol allegedly used in the killing, bullets taken from the pocket of defendant, the envelope in which the pistol was placed while in the State's possession, and bullet fragments removed from the body of deceased where the chain of custody of the exhibits was clearly and amply established.

6. **Criminal Law § 69— telephone conversation — identity of caller established**

    Before a witness may relate what he heard during a telephone conversation with another person, the identity of the person with

whom the witness was speaking must be established, and identity of the caller may be established by testimony that the witness recognized the caller's voice, or by circumstantial evidence.

7. **Criminal Law § 69— telephone conversation — identity of caller — circumstantial evidence**

Where a telephone call was made on the night of the crime to the house where the shooting subsequently occurred, and the caller identified himself only as "George," the trial court did not err in allowing evidence concerning the telephone conversation, though the caller's identification of himself as "George" was insufficient to establish his identity, since circumstantial evidence was sufficient to identify the caller.

APPEAL by defendant pursuant to G.S. 7A-27(a) from *Collier, J.,* 17 February 1975 Criminal Session of GUILFORD Superior Court.

The State's evidence, in summary, tended to show the following:

William Segal testified that on 4 May 1974 he left Charlotte at about 11:00 a.m. with defendant who was going to Greensboro for the purpose of picking up his girl friend, Ruby Jean McCrorey (Ruby). They arrived in Greensboro at about 1:00 and defendant went to several residences and made numerous telephone calls in a vain search for Ruby between 1:00 p.m. and 6:00 p.m. When they started back to Charlotte at about 6:00 p.m., the witness was driving because defendant was not feeling well. Segal became lost and finally turned around near the Virginia state line and they returned to Greensboro where defendant stopped at a hospital. There defendant made several telephone calls. They then drove to the police department where the witness and defendant parted company. Segal further testified that he had known Ruby while she and defendant were living together in Charlotte. He also identified State's Exhibit 2 as the .22 pistol he had seen in defendant's possession on 4 May 1974.

Police Officer James Hilliard testified that defendant came to the police station on 4 May 1974. Defendant had his girl friend's telephone number, but did not know her address. Using the City Directory, the officer located an address on Whittington Street that corresponded to the telephone number in defendant's possession. Defendant indicated to him that he had caught his girl friend with another man a few weeks prior to that day.

Joslyn Barnes testified that she and Ruby McCrorey were living in the Barnes's home at 213 West Whittington Street in Greensboro on 4 May 1974. On that day, they were having a surprise birthday party for Joslyn's mother. She stated that there were four telephone calls for Ruby between 9:00 and 12:00 p.m. The witness further testified that shortly after midnight she was standing beside Ruby at a point between the kitchen and the living room when defendant came through the front door into the house. At that time Ruby exclaimed "George," defendant shot twice and Ruby fell. She further testified that as she went out the front door, she looked back and saw Ruby falling. She passed very close to defendant as she left the house and she heard another shot after she had gone outside. She made an in-court identification of defendant as the man who did the shooting and identified State's Exhibit 2 as the murder weapon.

Harris Nesmith testified that he attended the party and that during the evening he answered the phone three times. We will fully consider the evidence concerning the telephone calls in the opinion. Nesmith further testified that at around midnight he was sitting in the kitchen drinking beer with Willie Watlington when he heard two shots. He at first thought that the explosions were caused by firecrackers. He got up to look when he heard the third explosion and at that time saw defendant with "the gun at the girl's head." Defendant came into the kitchen and "threw" the pistol on Willie Watlington but did not fire. Nesmith then left the house.

Willie Watlington gave testimony to the effect that he was sitting in the kitchen with Harris Nesmith when he heard a couple of shots. He also thought the noise was caused by firecrackers. Shortly thereafter defendant came into the kitchen with a pistol in his hand. At that time, the witness laid his head on the table. After defendant left, the witness went into the living room where he found Ruby lying on the floor. There was a wound on her head and it appeared that her ear had been shot off. The witness said that he had been "going with Ruby." He testified, over defendant's objection, that the pistol identified as State's Exhibit 2 was "something about like" the weapon the defendant had in his hand on the night of the party.

Cheryl Wilson said that she saw a man come in the front door and shoot Ruby. She was unable to identify the man who did the shooting.

Johnny Lee Brown testified that he was sitting in the living room of the house at 213 West Whittington Street at about midnight when he looked out the window and saw this "dude" running up the walk with a "shiny" gun in his hand. The man snatched the door open and fired a shot downward. The witness then fled. He identified defendant as the man who fired the pistol.

Portia Elaine Lindsey, who lived across the street from the house where the party was held, testified that she saw a cab and a green Chevrolet pull up before the house and she saw the cab driver point to the house at 213 West Whittington Street. The man who drove the green Chevrolet went to the front of the house and she heard someone say "George." This exclamation was followed by the sound of three shots. She later saw a man run from the house and as he turned toward a police officer, the police officer fired his pistol and the man fell. He fell near a streetlight. She identified defendant as the man who ran from the house and fell.

Officer K. L. Durham was riding along Whittington Street when he heard gunshots. He saw several people run out the front door of the house at 213 West Whittington Street. Defendant ran in front of him, stopped and pointed a pistol toward him and the pistol then made a clicking noise. Thereafter defendant ran and when the policeman called for defendant to stop, defendant made a turn toward him with the gun in his hand. Officer Durham fired one shot and defendant ran about fifty feet and fell. Upon taking defendant into custody, the officer observed a wound on defendant's right hand. The officer later picked up a .22 caliber pistol across the street from 213 West Whittington Street which he identified as State's Exhibit 2.

Officer Paul Biggs was also traveling on Whittington Street when he heard two or three shots. He parked his car and heard more shots when he approached 213 West Whittington Street. He saw a figure run from the house, heard a louder shot and shortly after he heard the louder shot, the running man fell. He later entered the house and found a wounded woman lying on the floor.

Dr. Edward A. Sharpless, an expert in pathology, testified that he performed an autopsy on the body of Ruby Jean Mc-Crorey on 5 May 1974. His examination revealed that deceased had been shot three times. One bullet entered the right shoulder

and followed a path approximately parallel with the floor. Another penetrated the skull from left to right taking a piece of deceased's left ear with it. The third bullet entered the top of her head passing forward and downward, penetrating both sides of the brain. In his opinion, the cause of death was the gunshot wound which penetrated deceased's brain.

The State rested and defendant thereupon testified that, accompanied by William Segal, he came to Greensboro on 4 May 1974 for the purpose of taking Ruby back home. He had been furnished an address on Ashe Street as the place where he might locate her and upon failing to find Ruby, he called her mother in New York who was unable to give him any information. He asked Segal to drive him back to Charlotte at about 6:00 p.m. because he felt bad as a result of a recent gunshot wound in his stomach. He went to sleep and when he awakened they were near the Virginia line. He then drove back to Greensboro where he made a call to Ruby's uncle in New York who agreed to contact Ruby and ask her to call defendant. Ruby called and some "dude" on the phone told him how to get to the hospital. He called Ruby from the hospital and she told him she would come there. He waited in the car for about an hour and tried without success to again call Ruby. He then went to the police station where a police officer helped him locate the residence at 213 West Whittington Street. He proceeded to that address. Upon going to the porch of the house, he heard shots and heard Ruby "holler." He entered the house and saw Ruby lying on the floor and at the same time observed someone going out the back door with a gun in his hand. Defendant stated that he pulled his pistol, ran to the back door, and shot several times. He came back to the place where Ruby was lying and saw a hand in the back door pointing a pistol. He then ran out the front door and heard another shot. He ran in front of a police car and saw someone pointing a gun at him. As he turned, a bullet struck him in the hand.

Defendant testified that he did not fire a shot at Ruby. He had no ill will toward her but to the contrary he loved Ruby. He admitted that he and Ruby had lived together in Charlotte for about two years and that there had been some misunderstanding between them.

Ruth DeBerry, an employee of Congessman Richardson Preyer, said that she lived directly across the street from the place where the party was held. She attended the party and as

State v. Williams

she was leaving, she heard a scream. She called the police and she heard further hollering from the house across the street. She went to her porch where she saw two people run from the back door of the house across the street and she then saw two flashes caused by gunfire.

The jury returned a verdict of murder in the second degree. Defendant appealed from judgment imposing a sentence of imprisonment for his natural life.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General William B. Ray and Associate Attorney Isaac T. Avery III, for the State.*

*Wallace C. Harrelson, public defender, for defendant appellant.*

BRANCH, Justice.

[1]   Defendant's first assignment of error presents the following question:

> WERE THE RIGHTS OF THE DEFENDANT TO BE PRESUMED INNOCENT UNTIL PROVEN GUILTY AND TO PLACE THE BURDEN UPON THE STATE TO PROVE EACH AND EVERY ELEMENT OF THE CRIME CHARGED BEYOND A REASONABLE DOUBT VIOLATED BY INSTRUCTING THE JURY THAT A KILLING IS PRESUMED UNLAWFUL AND DONE WITH MALICE WHEN A DEADLY WEAPON IS INTENTIONALLY USED?

Portions of the charge pertinent to this assignment of error are:

> "If the State proves beyond a reasonable doubt that the defendant intentionally killed Ruby Jean McCrorey with a deadly weapon or intentionally inflicted a wound upon Ruby Jean McCrorey with a deadly weapon that proximately caused her death, the law raises two presumptions; first, that the killing was unlawful, and, second, that it was done with malice."

> \*       \*       \*

> "In order for you to find the defendant guilty of second degree murder, the State must prove beyond a reasonable doubt that the defendant intentionally shot Ruby Jean McCrorey with a deadly weapon thereby proximately caus-

ing her death, then nothing else appearing, the defendant would be guilty of second degree murder."

Substantially similar instructions have been approved by many decisions of this Court. *State v. Rummage,* 280 N.C. 51, 185 S.E. 2d 221; *State v. Wrenn,* 279 N.C. 676, 185 S.E. 2d 129; *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65; *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328; *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305; *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337; *State v. Fleming,* 202 N.C. 512, 163 S.E. 453. In instant case the trial judge correctly submitted to the jury as possible verdicts first-degree murder, second-degree murder or a verdict of not guilty since these were the only verdicts supported by the evidence. There was no evidence that defendant acted in suddenly provoked heat of passion so as to reduce the crime to manslaughter; neither was there evidence that the killing was without intent to kill or to inflict serious injury so as to justify a charge on involuntary manslaughter. We note, in passing, that the evidence did not warrant a charge on self-defense or that the killing was by accident or misadventure. The State's evidence shows that defendant by the intentional use of a deadly weapon shot Ruby Jean McCrorey thereby proximately causing her death. Defendant's evidence was to the effect that he did not fire the weapon that caused her death. Thus this assignment of error only presents the question of whether the instruction was constitutionally impermissible because it raised the presumptions of malice and unlawfulness upon proof of certain basic facts thereby relieving the State of the burden of proving all elements of the crime beyond a reasonable doubt.

Presumptions and inferences may arise upon proof of another fact or combination of facts. The types of presumptions and inferences so arising include: (1) a *conclusive presumption* is one in which the presumed fact is deemed to be conclusively demonstrated upon proof of the basic fact and no evidence of the non-existence of the presumed fact will be heard. (2) a *prima facie case* or an inference may arise upon proof of the basic facts by which the jury may (but need not) find the presumed fact. (3) A *true presumption* is one in which the trier of the facts must find the presumed fact upon establishment of the basic facts unless sufficient evidence of its non-existence has been introduced. See 2 Stansbury's North Carolina Evidence (Brandis Revision 1973) § 215 at pages 166-169 and the cases there cited.

The United States Supreme Court and this Court recognize
that proof of certain basic facts in a criminal prosecution may
give rise to an inference (prima facie case) or a true presump-
tion. *Turner v. United States,* 396 U.S. 398, 24 L.Ed. 2d 610, 90
S.Ct. 642, reh. den. 397 U.S. 958, 25 L.Ed. 2d 144, 90 S.Ct. 939;
*United States v. Gainey,* 380 U.S. 63, 13 L.Ed. 2d 658, 85 S.Ct.
754; *Davis v. United States,* 160 U.S. 469, 40 L.Ed. 499, 16 S.Ct.
353; *State v. Rummage, supra; State v. Riera,* 276 N.C. 361,
172 S.E. 2d 535; *State v. Mercer, supra; State v. Allison,* 265
N.C. 512, 144 S.E. 2d 578.

It must be borne in mind that presumptions and inferences
differ. The distinctions between the two are well stated in 2
Stansbury's North Carolina Evidence (Brandis Revision 1973)
§ 218 beginning on page 172:

> ... [A] "prima facie case" or "prima facie evidence" means
> evidence sufficient to go to the jury in support of a fact to
> be proved. There is nothing compulsory about it; the jury
> may disbelieve the evidence presented, or believe the evi-
> dence but decline to draw the inferences necessary to a
> finding of the ultimate fact, or believe the evidence and
> draw the necessary inferences. In the case of a presump-
> tion, however, although the jury may still disbelieve the
> evidence and thus fail to find the existence of the basic fact,
> it should be told that if it finds the basic fact it *must* also
> find the presumed fact, unless evidence of its nonexistence
> is produced sufficient to rebut the presumption.

> It will thus be seen that a prima facie case and a pre-
> sumption differ sharply in their effect upon the burden of
> producing evidence. A prima facie case discharges the bur-
> den of the proponent, but does not shift the burden to his
> adversary. A presumption, however, not only discharges the
> proponent's burden but also throws upon the other party the
> burden of producing evidence that the presumed fact does
> not exist. If no such evidence is produced, or if the evidence
> proffered is insufficient for that purpose, the party against
> whom the presumption operates will be subject to an ad-
> verse ruling by the judge, directing the jury to find in
> favor of the presumed fact if the basic fact is found to
> have been established.

\*   \*   \*

. . . The general rule appears to be that a presumption merely fixes upon the opponent the burden of producing evidence, and leaves the burden of the issue unaffected. . . .

In this jurisdiction, upon proof that an accused intentionally inflicted a wound with a deadly weapon proximately causing death, *true presumptions* arise that the killing was unlawful and that it was done with malice.

Obviously such inferences and presumptions must arise within constitutional bounds and we therefore consider some of the cases which set out the standards of constitutionality which must be met.

In the case of *State v. Hales,* 256 N.C. 27, 122 S.E. 2d 768, Justice Parker (later Chief Justice) quoted with approval from 12 Am. Jur., Constitutional Law, Section 629, the following:

> "The legislature has power to enact provisions, even in criminal actions, that where certain facts have been proved, they shall be prima facie evidence of the main fact in question if the fact proved has some fair relation to, or natural connection with, the main fact. There is no vested right to the rule of evidence that everyone shall be presumed innocent until proved guilty, which prevents the legislature from making the doing of certain acts prima facie proof of guilt or of some element of guilt." To the same effect: *S. v. Barrett,* 138 N.C. 630, 50 S.E. 506; *S. v. Dowdy,* 145 N.C. 432, 58 S.E. 1002; *S. v. Hammond,* 138 N.C. 602, 125 S.E. 402; *S. v. Fowler and Brincefield,* 205 N.C. 608, 172 S.E. 191; *Casey v. U. S.,* 276 U.S. 413, 72 L.Ed. 632; 16 C.J.S., Constitutional Law, Section 128(d).

We note with interest that the author of *Mullaney v. Wilbur,* 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881, Mr. Justice Powell, writing for the Court in the case of *Barnes v. United States,* 412 U.S. 837, 37 L.Ed. 2d 380, 93 S.Ct. 2357, approved an instruction that "possession of recently stolen property, if not satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw the inference and find, in the light of the surrounding circumstances shown by the evidence in the case, that the person in possession knew the property had been stolen." In holding this instruction to comport with due process the Court reviewed and relied on the recent cases of *Turner v.*

*United States, supra; Leary v. United States,* 395 U.S. 6, 23 L.Ed. 2d 57, 89 S.Ct. 1532, and *United States v. Gainey, supra.*

In *Gainey* the Court upheld the constitutionality of a statute which allowed the jury to infer from the defendant's unexplained presence at an illegal still that he was engaged in the "business of a distillery." The Court reasoned that there was a "rational connection between the fact proved and the ultimate fact presumed" because of the comprehensive nature of the charge and the fact that the operation of illicit stills is secret and furtive in nature.

In *Leary* the Court upheld a challenge to a statutory inference that possession of marijuana, unless satisfactorily explained, was sufficient to prove that defendant knew that the marijuana was illegally imported into the United States. The Court reasoned that the inference did not meet due process standards since it was altogether probable that defendant believed he possessed domestically grown marijuana. In reaching its decision, the Court stated that an inference is " 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that *the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.*" [Emphasis ours.]

The most stringent standard employed by the Supreme Court in this line of cases is the reasonable doubt standard, *i.e.,* proof necessary to invoke the presumption must be sufficient for a rational juror to find the presumed fact beyond a reasonable doubt. This standard was applied in the *Turner* case which upheld the constitutionality of an instruction that possession of heroin was sufficient to support an inference that the defendant knew the drug had been illegally imported.

We are of the opinion that when the State proves beyond a reasonable doubt that an accused intentionally inflicted a wound with a deadly weapon proximately causing death, such basic facts are sufficient to meet the most stringent of the standards of due process recognized by the Court. Establishment of the presumption requires the triers of fact to conclude that the prosecution has met its burden of proof with respect to the presumed fact by having established the required basic facts beyond a reasonable doubt. This does not shift the ultimate burden of proof from the State but actually only shifts the burden of going forward so that the defendant must present some evi-

dence contesting the facts presumed. We, therefore, hold that the presumptions here challenged comport with due process. See *Mullaney, supra,* page 522 n. 31. See also 2 Stansbury's North Carolina Evidence (Brandis Revision 1973) §§ 215, 218, and *Barnes v. United States, supra,* page 846 n. 11.

Here the evidence shows that defendant crashed into a dwelling, shot the deceased three times at close range thereby inflicting wounds which proximately caused her death. This shooting occurred upon a background of a lover's quarrel and a separation after the parties had lived together for several months. This evidence was amply sufficient to allow the jury to find beyond a reasonable doubt that defendant's intentional use of the deadly weapon which inflicted the mortal wound upon Ruby Jean McCrorey was done unlawfully and with malice.

The identical question presented by this assignment of error was before us in *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712 (decided 30 August 1974) *petition for cert. filed,* 43 U.S.L.W. 3392 (U.S. Nov. 29, 1974) (No. 669), and this Court unanimously rejected defendant's contention that presumptions of malice and unlawfulness arising from the State's proof that the deceased's death was proximately caused by the defendant's intentional use of a deadly weapon were constitutionally impermissible. However, defendant strongly urges that the rule approved in *Sparks* has been overruled by *Mullaney v. Wilbur, supra.* We do not agree.

In *Mullaney* the defendant was charged with murder. At trial the trial judge instructed the jury that the defendant was required to prove by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce the homicide from murder to manslaughter. The jury returned a verdict of guilty of murder. Defendant appealed and the Supreme Court of Maine affirmed. After the case had been considered by lower federal courts, the United States Supreme Court allowed certiorari and held that this instruction violated the due process clause in that it relieved the prosecution of the requirement that it prove every element of a crime beyond a reasonable doubt. The Court, in part, stated:

> Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant

can be given a life sentence when the evidence indicates that it is *as likely as not* that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship*, 397 U.S., at 372, 25 L.Ed. 2d 368, 90 S.Ct. 1068 (concurring opinion). We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case. . . .

The sole issue presented in *Mullaney* was whether the Maine rule which placed the burden upon defendant to prove that he acted in the heat of passion on sudden provocation so as to reduce the crime from murder to manslaughter accorded with due process. We find nothing in *Mullaney* which declares that due process is violated by a rule which allows rational and natural presumptions or inferences to arise when certain facts are proved beyond a reasonable doubt by the State.

We hold that the challenged charge did not unconstitutionally relieve the State of its burden to prove beyond a reasonable doubt each and every element of the crime charged.

[2]  Defendant next contends that the trial court erred in instructing the jury that second-degree murder differs from first-degree murder in that neither specific intent to kill, premeditation, nor deliberation is necessary. Defendant does not argue that premeditation or deliberation are constituent elements of second-degree murder but takes the position that the terms "intentionally killed" and "specific intent to kill" are for all practical purposes the same. This contention is contrary to the overwhelming weight of authority.

Murder in the second degree is the unlawful killing with malice. A specific intent to kill while a constituent of the elements of premeditation and deliberation in first-degree murder, is not an element of second-degree murder. *State v. Mercer, supra; State v. Meadows*, 272 N.C. 327, 158 S.E. 2d 638; *State v. Gordon*, 241 N.C. 356, 85 S.E. 2d 322. In second-degree murder the intention to do an unlawful act supplies the requisite mental element. 40 Am. Jur. 2d, Homicide, § 10, page 301.

In *State v. Gordon, supra,* we stated:

But the expression, *intentional killing,* is not used in the sense that a specific intent *to kill* must be admitted or established. The sense of the expression is that the presumptions arise when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted. . . .

We find no error in this portion of the trial judge's charge.

[3]  By his sixth assignment of error, defendant argues that the trial judge erred in allowing a police officer to testify over objection that during a conversation with defendant on 8 May 1974 defendant failed to make a statement as to the events of the night of 4 May or the early morning hours of 5 May 1974.

The record discloses that defendant was served with a warrant charging him with murder in the first degree on 5 May 1974 and that he was held without bond until after his preliminary hearing. The record does not show that the conversation was an interrogation. Neither does it show that the defendant was specifically asked about the events of 4 and 5 May 1974.

After defendant had testified, police officer Everett Bruce was offered by the State in rebuttal and the following occurred:

MR. JOHN:

Q. Let me ask you this, Detective Bruce, during the course of your investigation, how many times, if ever, did you have to discuss these incidents or attempted to discuss these incidents with the defendant?

MR. HARRELSON: OBJECTION.

THE COURT: OVERRULED.

A. (By the witness) I talked with him at Cone Hospital on May 8, 1974, at approximately 3:10 p.m.

Q. And did you talk to him at any time after that, Detective Bruce?

A. No, sir, I didn't.

Q. At any time during the course of your investigation, did the defendant offer any statement to you as to the

events of the night of May 4th or late night of May 4th and early morning of May 5th, 1974?

MR. HARRELSON: OBJECTION.

THE COURT: OVERRULED.

A. (By the witness) No, sir, he did not.

In *State v. Castor,* 285 N.C. 286, 204 S.E. 2d 848, we held that a defendant's constitutional right to remain silent while in custody precludes the admission of testimony that defendant remained silent in the face of accusations of his guilt. In that case defendant did not testify. The holding, however, was based squarely on defendant's right against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 23 of the North Carolina Constitution.

The State, relying on *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111, contends that when defendant testified, evidence of his in-custody silence was admissible for the purpose of impeachment. In *Bryant* we held that an illegally obtained statement taken from defendant could be used to impeach him after he became a witness in his own behalf. Instant case and *Bryant* are distinguishable in that a prior inconsistent statement by the defendant in *Bryant* obviously had a material bearing on his credibility as a witness. Conversely under the facts before us no such inference can be drawn solely from defendant's silence. See 2 Stansbury's North Carolina Evidence (Brandis Revision 1973) § 179 n. 96 at page 54.

We hold that under the circumstances of the case before us the State could not offer defendant's silence as evidence of his guilt or for the purpose of impeaching him as a witness. However, this evidence was of such insignificant probative value when compared with the overwhelming competent evidence of guilt that its admission did not contribute to defendant's conviction and therefore admission of the evidence was harmless error beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824; *State v. Taylor,* 280 N.C. 273, 185 S.E. 2d 677; *State v. Swaney,* 277 N.C. 602, 178 S.E. 2d 399.

[4] Defendant assigns as error an instruction by the court to the effect that a mistrial, because the jury could not agree upon

a verdict, would result in great expense to the State and County. Defendant contends that this instruction might well have coerced the jury into returning a hasty and ill-conceived verdict.

The jury began its deliberation on 6 March, 1975 at 5:38 p.m. The jury was returned to the courtroom at 10:30 p.m. on the same day and at that time the trial judge charged:

> Members of the jury, since we have not heard from you, I assume that you have not yet agreed on your verdict. I presume that you ladies and gentlemen realize what a disagreement means. It means, of course, that another three or four days or more of the time of the Court will have to be consumed in the trial of this action again.
>
> I do not want to force you or coerce you in any way to reach a verdict, but it is your duty to try to reconcile your differences and reach a verdict if it can be done without any surrender of one's conscientious convictions.
>
> You have heard the evidence in this case. A mistrial, of course, would mean another jury would have to be selected to hear the case and the evidence all over again at great costs and expense to our state and your county.
>
> Now, I recognize the fact that there are sometimes reasons why jurors cannot agree, and I want to emphasize the fact that it is your duty to do whatever you can to reason the matter out, if you can, as reasonable men and women, and to reconcile your differences if such is possible without the surrender of conscientious convictions, and to reach a verdict.
>
> With that admonition, I will ask you to please go back and see if you can agree on your verdict in this case. You may continue for deliberations.

In *State v. Brodie*, 190 N.C. 554, 130 S.E. 205, this Court found no prejudicial error under the following circumstances:

> For three days the jury had been unable to agree on a verdict and on Saturday morning came into the courtroom and announced that they could not agree. They were requested to give the case further consideration and were afterwards recalled. Not having agreed they were given this instruction: "I presume you gentlemen realize what a disagreement means. It means that four more days of

the time of the court will have to be taken up at the expense of several hundred dollars. I do not want to force or coerce you into an agreement and could not if I wished to do so, but still it is your duty as intelligent, reasonable men to consider the evidence, reconcile it, reason the matter over among you and come to an agreement. A mistrial is always a misfortune to any case or to any county. Jurors, if they cannot render verdicts, are entirely useless. It is the duty of jurors to agree if possible and I hope you gentlemen can retire and consider the matter further, reason with each other as intelligent men and come to an agreement."
. . .

In *State v. Lefevers,* 216 N.C. 494, 5 S.E. 2d 552, the Court found no error in this portion of the trial judge's charge:

. . . [I]t is your duty to decide it because it is an expense to the county to retry it. And it is your duty to try to come to some agreement. I am not trying to force you to agree on this case and you may go back to the jury room and continue your deliberation. . . . Remember about the expense of this case and the fact that someone has to try it. . . .

The following statement appears in 3 Strong, N. C. Index 2d, Criminal Law § 122 at page 34:

. . . [T]he court may properly instruct the jury that the trial of the cause involved heavy expense to the county and that it was the duty of the jury to continue its deliberations and attempt to reach an agreement, but that the court was not attempting to force an agreement.

It is true that two of the cases relied upon to support the statement in *Strong* did not involve the question of expense to the county and State, however, this statement has been quoted with approval in the recent cases of *State v. Brown,* 280 N.C. 588, 187 S.E. 2d 85, cert. denied 409 U.S. 870; and *State v. McVay* and *State v. Simmons,* 279 N.C. 428, 183 S.E. 2d 652.

It is a well-recognized rule that a charge must be read as a whole and isolated portions will not be held to be prejudicial when the charge as a whole is correct. *State v. Lee,* 277 N.C. 205, 176 S.E. 2d 765. Here defendant's attack is upon the isolated portion of this instruction which refers to the expense which would result if no verdict were returned. However, a

contextual reading of the charge reveals that the trial judge subsequently admonished the jurors that the court did not intend to force or coerce the jury into reaching a verdict and that a juror should not reach a verdict which required him to surrender his conscientious convictions. In our opinion, the isolated portion of the court's instruction here challenged would not coerce or prejudice the mind of a juror of ordinary firmness and intelligence.

We hold that this instruction did not amount to an expression of opinion by the trial judge as to defendant's guilt or innocence or coerce the jury into returning an ill-conceived verdict.

[5] Defendant assigns as error the introduction into evidence and the admission of the testimony concerning certain exhibits offered by the State.

The exhibits which are the subjects of this assignment of error are Exhibit 2, the .22 pistol allegedly used in the killing, State's Exhibit 10, bullets taken from the pocket of defendant, State's Exhibit 13, the envelope in which Exhibit 2 was placed while in the State's possession, and State's Exhibit 14, bullet fragments removed from the body of deceased.

We initially note that the pistol was properly *introduced* into evidence since it was positively identified by several State's witnesses and because the defendant admitted that it was the weapon which he fired several times at the scene of the killing. The State offered evidence which tended to show a chain of custody of all exhibits from the time they were originally obtained by the police officers until they were mailed to F.B.I. headquarters by registered mail. The exhibits were then returned to the Greensboro Police Department from the F.B.I. headquarters by registered mail. The police department delivered them to the District Attorney and they were thereafter at all times in the possession of the District Attorney or in a vault in the office of the Clerk of Superior Court of Guilford County. The bullet fragments were in the same condition as when received by the police. The defendant argues that since there was no showing that the vault was an "evidence vault" and because there was no specific showing of who had custody of the vault, that there was a "missing link" in the chain of custody. We are of the opinion that the chain of custody was clearly and amply established. However, assuming *arguendo,*

State v. Williams

that chain of custody was not properly established, we find little prejudice in the testimony concerning these exhibits since the expert witness testified that the bullet fragments were so badly mutilated that he could form no opinion as to whether they were fired from State's Exhibit 2. All of these exhibits were sufficiently relevant to be admissible into evidence since they tended to shed some light upon the crime charged. *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561. Defendant's claim of prejudice from the introduction of these exhibits is further diluted by the fact that generally the inferences which flow from the introduction of the exhibits are consistent with defendant's testimony and theory of defense. This assignment of error is overruled.

The introduction of and testimony concerning State's Exhibit 9, pistol grips found near the place of defendant's arrest, tended only to show that the grips *might* have been a part of State's Exhibit 2. Admittedly this evidence is of little probative force since defendant admitted possession of the weapon at the time of the killing. By the same token, the introduction of this exhibit and the testimony admitted concerning it did not result in prejudice to defendant.

[6, 7] Finally, defendant argues that the trial judge erred by admitting evidence concerning a telephone call by a person who identified himself only as "George."

The witness Harris Nesmith testified that on the evening of 4 May 1974, he was attending a party in the house where the killing later occurred. He answered the telephone on three occasions. The first call was placed by someone who identified himself as "George" who requested that he be allowed to speak to deceased, Ruby Jean McCrorey. The witness said that the three calls were placed by the same person and that the caller identified himself on the first call and the last call as "George.' The testimony to which defendant objects appears in the record as follows:

Q. What, if anything, did he say to you in the course of the conversation?

MR. HARRELSON: OBJECTION.

THE COURT: OVERRULED.

A. (By the witness) He said he'd come to kill two.

MR. HARRELSON: OBJECTION and move to STRIKE.

Before a witness may relate what he heard during a telephone conversation with another person, the identity of the person with whom the witness was speaking must be established. *State v. Gardner,* 227 N.C. 37, 40 S.E. 2d 415; *Griffin Mfg. Co. v. Bray,* 193 N.C. 350, 137 S.E. 151. Identity of the caller may be established by testimony that the witness recognized the caller's voice, or by circumstantial evidence. *State v. Coleman,* 270 N.C. 357, 154 S.E. 2d 485; *State v. Gardner, supra;* 2 Jones on Evidence, § 7:33 (6th ed. 1972); 7 Wigmore on Evidence § 2155 (3d ed. 1940). The fact that the caller identified himself as "George" was not sufficient to establish his identity. However, in addition to the testimony of the witness Nesmith concerning the telephone calls, the record discloses the following circumstantial evidence:

William Segal testified that defendant made three or four telephone calls on the evening of 4 May 1974 between 9:30 and 10:00 p.m.

Joslyn Barnes testified that several telephone calls were received at her house on the night in question, and that the caller each time asked to speak to Ruby. The first call occurred at about 9:00 and the last call was made around 11:45.

The State's evidence also tended to show that shortly after the last telephone call defendant, armed with a pistol, burst into the Barnes's living room and shot Ruby. Just before she was shot, Ruby exclaimed "George."

Defendant admitted on cross-examination that he made two calls to Ruby. He related that on one occasion he was able to talk with her and on another occasion he did not talk to anyone. Defendant further testified that Ruby called him one time on the night in question and he asked her for directions to a hospital, and she had another person give him the requested directions.

We are of the opinion that the circumstantial evidence was sufficient to identify the caller and to permit the trial judge to overrule defendant's objection to the admission of this evidence.

Even had the evidence been improperly admitted, defendant would not be entitled to a new trial. Subsequent to the admission of the challenged testimony the District Attorney, without objection, asked Nesmith, "He said he'd come to kill

two?" The witness then answered, "Yes, and he asked me my name but I wouldn't tell him."

When testimony is improperly admitted over defendant's objection, but the same or similar evidence is thereafter admitted without objection, exception to the admission of the evidence is waived. *State v. Greene,* 285 N.C. 482, 206 S.E. 2d 229; *State v. Jarrett,* 271 N.C. 576, 157 S.E. 2d 4; *State v. Creech,* 265 N.C. 730, 145 S.E. 2d 6; *State v. Gaskill,* 256 N.C. 652, 124 S.E. 2d 873. Further, admission of this evidence went solely to the question of premeditation and deliberation. The jury's verdict of second-degree murder acquitted defendant of the charge of murder in the first degree and therefore rendered harmless any prejudice which might have arisen from its admission. This assignment of error is overruled.

Defendant's counsel concedes that the remaining assignments of error are formal and are brought forward for the purpose of preserving the record. Nevertheless we have carefully examined this entire record and each assignment of error and find no error warranting a new trial or that the judgment be disturbed.

No error.