STATE OF NORTH CAROLINA v. WILLIAM EDWARD HAMLETTE

No. 829SC102

(Filed 18 January 1983)

1. **Criminal Law § 73.4— victim's statements to police—admissibility as res gestae**

    In a prosecution for second degree murder, the trial court correctly admitted into evidence as part of the *res gestae* certain statements made by the victim to police officers shortly after he was shot. The prosecution was a retrial of defendant's case, and the Supreme Court had found the victim's statements admissible in defendant's first trial. The only additional evidence defendant offered upon retrial was that the victim had visited the defendant and his accomplice or both on different occasions; however, that evidence did not indicate that the victim was untruthful when he stated he did not know where defendant and his accomplice lived.

2. **Homicide § 16.1— dying declaration—later statement indicating hope of recovery**

    The fact that a victim indicated some hope of recovery on a date after having previously given a statement qualifying as his dying declaration, did not preclude the earlier statement from qualifying as a dying declaration.

**3. Criminal Law § 69— telephone conversation—identity of person on other end of telephone inadmissible**

In a prosecution for second degree murder where the victim was shot while speaking on the telephone in a telephone booth, and where an investigating officer testified that he picked up the receiver and discovered that someone was on the line, that he identified himself and the other person then identified herself, the trial court correctly sustained the State's objection as to the other person's identity since the officer admitted he had never talked to the other person on the telephone before, did not know or recognize her voice and did not know if in fact it was the person identified on the telephone.

**4. Criminal Law § 35— offense committed by another—evidence corroborating defendant's version improperly excluded**

The trial court improperly excluded the testimony of two officers which tended to show that the person who defendant contended committed the murder he was charged with found the gun and delivered the weapon to the officers after being instructed to do so. The excluded evidence corroborates defendant's version of the shooting that the other person was the guilty party and its exclusion was prejudicial to the defendant.

**5. Criminal Law § 35— negative evidence that crime not committed by another—inadmissible**

The trial court erred in allowing a detective and a lieutenant to testify that in the course of their investigations they were unable to establish that the person who defendant had said shot the victim had taken any part in the killing of the victim since the extent of their involvement in the case was insufficient to form an adequate basis for admission of their negative testimony. Neither the detective nor the lieutenant, without relying upon statements made by others, was in a position to know first hand that the person whom defendant accused of shooting the victim did or did not take part in the shooting or that the gun in evidence was or was not the weapon used in the shooting.

APPEAL by defendant from *Hobgood, Judge.* Judgment entered 4 September 1981 in Superior Court, PERSON County. Heard in the Court of Appeals 13 September 1982.

The present appeal is the second appeal of this case. In *State v. Hamlette,* 302 N.C. 490, 276 S.E. 2d 338 (1981) ("*Hamlette I*"), defendant was found guilty of murder in the first degree of Willard Lawrence Bailey. The Supreme Court reversed the conviction for erroneous exclusion of evidence offered by the defendant tending to show that it was not the defendant, but State's witness—Earl Torain—who shot Bailey. On retrial, defendant was found guilty of second degree murder. From the conviction and judgment, defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General Daniel C. Oakley, for the State.*

*Ramsey, Hubbard & Galloway, by Mark Galloway, for defendant appellant.*

JOHNSON, Judge.

On 21 February 1980, around 11:00 p.m., in Roxboro, North Carolina, Willard Lawrence Bailey was shot three times. Shortly after the shooting Bailey talked with three law enforcement officials and one lay witness. Bailey identified the defendant as the person who shot him to each of these witnesses. Bailey died 5 March 1980 as a result of the gunshot wounds.

Defendant presented evidence which tended to show that he did not shoot Bailey, but that Bailey was shot by Earl Torain. Defendant presents eleven assignments of error and argues that the trial court erred in its evidentiary rulings.

I

[1] Defendant contends that the trial court committed prejudicial error in permitting Officer Pricilla Betterton and Detective Steve Clayton to testify to statements Bailey made to them under the *res gestae* exception to the hearsay rule. Defendant argues that the statements were untrustworthy in that they contained a fabrication, to wit; when Bailey was asked if he knew where defendant and Torain lived, Bailey stated that he did not know and further, *Bailey's statements were made only in response to* specific inquiries and were not made contemporaneously with the events or with enough spontaneity to qualify as admissible *res gestae* statements.

Except for the additional argument that Bailey's utterances contained a fabrication, defendant raised this exact objection at his previous trial. As in *Hamlette I,* the evidence in this case showed that at 11:00 p.m. on 21 February 1980, in Roxboro, North Carolina, Pricilla Betterton, an off-duty policewoman, while sitting in her parked car in front of a Convenience Corner store, heard four to six gunshots. Approximately one minute after hearing the shots she saw Bailey run past her car into the Convenience Corner store. As Bailey emerged from the store Betterton approached him. She saw blood below his rib cage and in his mouth

and asked him what was wrong. He replied that he had been shot. She told him to sit down and asked him who shot him. Bailey replied, "William Hamlette." Bailey also stated that Hamlette left with Earl Torain in a 1965 Mercury. Betterton then went into the store, got a paper bag upon which to make notes, and returned to Bailey. She again asked him who shot him, and for the second time he replied, "William Hamlette." She asked if they had an argument and Bailey responded that he "was hurting" and wanted an ambulance. This conversation between Betterton and Bailey took place within three minutes of the shots.

Det. Clayton arrived at the scene and observed Bailey lying on the sidewalk with blood running from his mouth and blood stains on his shirt. Clayton talked to Officer Betterton for about two minutes and proceeded to talk with Bailey at approximately 11:10 p.m. In response to Clayton's questions, Bailey stated he had been shot by William Hamlette, Earl Torain was with Hamlette, Hamlette and Torain left in a 1965 Mercury headed north toward South Boston, the shooting had occurred at the telephone booth, and "he could see the people when the shooting occurred." Clayton asked Bailey if he knew where defendant and Torain lived. Bailey responded that he did not. Bailey was then transported by ambulance to Person County Hospital.

The trial court conducted *voir dire* to determine the admissibility of Bailey's statements to the officers. At the conclusion of the hearing, the court ruled that the statements were admissible under the *res gestae* exception to the hearsay rule.

The evidence regarding Bailey's statements to the officers and the circumstances surrounding the taking of the statements is identical to that presented in *Hamlette I,* with the exception of Bailey's statement that he didn't know where defendant and Torain lived and defendant's evidence that Bailey had visited Torain's and defendant's residences on prior occasions. On the basis of this additional evidence, defendant argues that the Supreme Court's ruling that the statements are admissible as spontaneous utterances in *Hamlette I* is not applicable in the case *sub judice.*

Statements are admissible as spontaneous utterances when made by a participant or bystander in response to a startling or unusual incident whereby the declarant is without oppor-

tunity to reflect or fabricate. *State v. Bowden*, 290 N.C. 702, 228 S.E. 2d 414 (1976); *see generally*, 1 Stansbury's N.C. Evidence § 164 (Brandis rev. 1973); McCormick on Evidence § 297 (1972). "[S]uch statements derive their reliability from their spontaneity when (1) there has been no sufficient opportunity to plan false or misleading statements, (2) they are impressions of immediate events and (3) they are uttered while the mind is under the influence of the activity of the surroundings." *State v. Deck*, 285 N.C. 209, 214, 203 S.E. 2d 830, 833-34 (1974); *see also State v. Johnson*, 294 N.C. 288, 239 S.E. 2d 829 (1978); *State v. Cot*, 271 N.C. 579, 157 S.E. 2d 142 (1967). It is this *spontaneity* and not being *part* of the incident which makes it relevant evidence. For example, where the utterance is made by an observer and not a participant, the statement may be admissible. *See*, e.g., *State v. Feaganes*, 272 N.C. 246, 158 S.E. 2d 89 (1967). Also, statements made after and therefore not part of the event are admissible if they are spontaneous utterances. *See*, e.g., *State v. Spivey*, 151 N.C. 676, 65 S.E. 995 (1909); Annot., 4 ALR 3d 149 (1965). (Emphasis original.)

*Hamlette*, 302 N.C. at 494-495, 276 S.E. 2d at 342. The Supreme Court ruled that the following facts and circumstances supported the trustworthiness of Bailey's statements:

[O]nly three minutes passed between the witness Betterton's hearing of the shots and Bailey's statement that defendant shot him. Within thirteen minutes after the shooting, Bailey told Clayton that defendant had shot him. When he made these statements, he was suffering from three gunshot wounds, was bleeding from the mouth and chest, was at the crime scene and, at the time of the second statements, was being prepared by ambulance attendants for the trip to the hospital.

*Id.*

The Court stated that the statements do not in any way lose their spontaneous character because they were made in response to questions such as "What is wrong?", "Who shot you?", and "How did they leave?"

Defendant argues that certain evidence produced tends to show that Bailey fabricated his statements regarding his knowl-

edge of where Torain and defendant lived and that the trial court failed to consider this additional evidence in making its ruling.

The evidence defendant points to may indicate that Bailey had visited either Torain or defendant or both on different occasions. However, it does not indicate that Bailey was untruthful when he stated he did not know where defendant and Torain lived. Bailey's answers to Det. Clayton's questions were not obviously false; indeed it is possible that Bailey did not know their exact street addresses. The evidence defendant presented upon retrial contains no additional indication that Bailey had an opportunity to reflect upon or fabricate his statements at the time of the shooting.

It must be remembered that the slight possibility that Bailey may not have been accurate in all of his statements is to be viewed in light of the circumstances under which the statements were made. Bailey had just been shot three times, was in pain and bleeding. Nothing in the record suggests that Bailey had the opportunity or time to have planned to mislead or reflect upon and prepare false statements. Rather, the responses are more appropriately characterized as excited utterances produced by a startling event.

The trial court considered all of the evidence including that which indicated Bailey knew where Torain and defendant lived and had visited them on various occasions. The trial court correctly admitted the subject statements into evidence as part of the *res gestae* of the event under the rule announced in *Hamlette I*. Therefore, defendant's assignment is without merit.

II

[2] Defendant next argues that the trial court erred in admitting into evidence Bailey's statement to Lieutenant Ashley that defendant was the one who shot him.

This exact assignment of error was also raised in *Hamlette I*, where the Supreme Court held the statements admissible under the dying declaration exception to the hearsay rule. Defendant contends that the ruling in *Hamlette I* is not applicable because there was evidence presented upon retrial that Bailey, while

hospitalized, had indicated that he would "be okay," thus negating a belief in impending death.

The trial court conducted *voir dire*. The evidence showed that Lt. Ashley talked to Bailey in the emergency room at Person County Hospital. The conversation took place between thirty minutes and one hour after Bailey was shot. Bailey had gunshot wounds to his chest, had not yet undergone surgery, and was being administered blood transfusions. Bailey was in extreme pain and appeared to have difficulty breathing. Ashley asked Bailey who shot him. Bailey twice stated that "William Hamlette" shot him. The following morning before Bailey underwent surgery, Ashley returned to Person County Hospital and spoke to him in the Intensive Care Unit. Bailey again identified defendant as the person who shot him. At the time no one told Bailey he was dying and Bailey did not indicate he had such a belief.

Debbie Moss testified that she talked to Bailey at Person County Hospital the night of 21 February 1980, but that Bailey did not say anything about how he felt. Sometime after 21 February 1980, she again saw Bailey at Person County Hospital at which time Bailey stated that he would "be okay."

In *Hamlette I* the Supreme Court stated:

The wounds, the time and the surroundings were such that a man could justifiably believe his death was imminent and believe he had no hope of recovery. The fact that Bailey lingered for several days does not render his statement inadmissible.

302 N.C. at 497, 276 S.E. 2d at 343.

In the case *sub judice* the trial court held that Bailey's statements to Ashley on the evening of 21 February 1980, were admissible as dying declarations and his later statements to Ashley on 22 February 1980 were admissible to corroborate the earlier dying declarations.

The evidence presented upon retrial is virtually identical to that presented in *Hamlette I*. The trial court's ruling is consistent with the Supreme Court's decision in *Hamlette I*. The fact that Bailey indicated some hope of recovery on a date after having previously given a statement qualifying as a dying declaration,

does not preclude the earlier statement from qualifying as a dying declaration. *State v. Hamlette, supra, citing State v. Harding,* 291 N.C. 223, 230, 230 S.E. 2d 397, 401 (1976). The defendant's assignment of error is without merit.

### III

[3] Defendant next contends that the court erred in excluding testimony from Det. Clayton as to the identity of the person on the telephone line being used by Bailey at the time he was shot.

On direct examination Det. Clayton testified that after Bailey was removed from the scene he observed the damage to the telephone booth Bailey was using and noticed that the telephone receiver was hanging from the hook. On cross-examination Clayton testified that he picked up the receiver and discovered that someone was on the line, that he identified himself and the other person then identified herself. Defense counsel sought to have Clayton testify to the name the person identified herself by. The court sustained the State's objection. Defendant's motion to include Clayton's answer into record was allowed. In the jury's absence Clayton testified, "She said she was Debbie Moss." He admitted he had never talked to Debbie Moss on the telephone before, did not know or recognize her voice and did not know if in fact it was Debbie Moss on the telephone. Det. Clayton testified further that he never interviewed anyone named Debbie Moss.

At the conclusion of this hearing, the court again sustained the objection. The jury was returned to the courtroom and the defense was permitted to conclude its cross-examination of Det. Clayton. Lt. Melvin Ashley was called as the State's next witness. The State sought to introduce Bailey's statements to Ashley shortly after the shooting as dying declarations.

The court again conducted *voir dire* during which Debbie Moss testified for the defendant. She testified that she heard gunshots on the night in question while talking on the phone with Bailey. She stayed on the phone for a while. Someone spoke and identified himself as Det. Steve Clayton and she then identified herself. Det. Clayton told her to "come to town." Moss went to Person County Memorial Hospital and talked to Bailey. Defendant further examined Moss regarding statements Bailey purportedly made to her regarding how he felt.

Defendant's examination of Moss during Lt. Ashley's *voir dire* was to show that (1) she went to Person County Memorial Hospital shortly after the shooting, (2) she talked to Bailey and (3) at the time she talked to Bailey he had hopes of survival. The State was attempting to introduce Bailey's statements to Lt. Ashley as dying declarations, while defendant was seeking to have Bailey's statements to Ashley excluded.

Defendant argues that Moss' testimony given during Ashley's *voir dire* establishes the identity of the person Det. Clayton talked to on the telephone shortly after the shooting, and that the court therefore erred in excluding Clayton's testimony that the person identified herself as "Debbie Moss" as hearsay.

Before a witness may relate what he heard during a telephone conversation with another person, the identity of the person with whom the witness was speaking must be established. The identity of the person may be established by testimony that the witness recognized the other person's voice, or by circumstantial evidence. *State v. Williams*, 288 N.C. 680, 220 S.E. 2d 558 (1975).

Defendant is correct that Moss' testimony establishes the identity of the person with whom Det. Clayton spoke to by telephone shortly after the shooting. However, this evidence was presented during the *voir dire* hearing regarding Lt. Ashley's testimony and did not relate back to the examination of Det. Clayton. At the time defendant presented this evidence as to the identity of Debbie Moss, all examination of Det. Clayton had concluded, the court had reaffirmed its ruling and the State had called and was examining its next witness regarding other matters. At no time after the court's ruling and after Moss' testimony did defendant request the court to reconsider its earlier ruling. We hold that the court's ruling was correct. This assignment of error is without merit.

IV

[4] By assignments of error 6, 7, 8 and 11, defendant contends that the court erred in excluding certain testimony from the defendant and Lieutenant Donnell Clayton concerning statements made to them by Earl Torain.

Defendant testified it was not he, but Earl Torain who shot Bailey. Further, that while he was driving his car north on U.S. 501 Torain, who was in the passenger's seat, directed defendant to turn around and enter the Convenience Corner parking lot. Defendant did so without any knowledge of Torain's intention to shoot someone. Defendant testified Torain shot Bailey without warning.

Defendant argues that certain testimony excluded by the trial court would show that Torain possessed ill will toward Bailey and a motive to shoot him.

Defendant was allowed to testify that on the Monday night before the Thursday shooting, he drove Torain to Debbie Moss' house. Torain entered the house while defendant remained in the car. Approximately five minutes later Torain returned to the car, followed by Bailey who was holding a shotgun. Defendant and Torain drove away. The trial court excluded testimony that Torain stated as they left, "Let's go, but he won't always have the ups on me like this." The court also would not permit defendant to testify that on the night of the shooting, Earl Torain stated, "Willard Bailey thinks he's running things down at Debbie's house." Defendant was allowed to testify that he and Torain drove past the Convenience Corner. The trial court excluded testimony that Torain stated to defendant, "turn around and go back, that's the man I want to see." Defendant was allowed to testify that as they drove toward the Convenience Corner, they stopped at the Foodliner where Torain attempted to make a telephone call. The trial court excluded defendant's testimony that Torain stated, "the line was busy now, we'll try another booth before we get there, before we get to Debbie Moss' house." Defendant was allowed to testify that immediately after the shooting he stopped at Roy Paylor's place where Torain got out and left with the gun. Defendant went home and shortly after he arrived home Torain came to his apartment and made a statement to him. The trial court excluded defendant's testimony that Torain told him, "Be cool, don't say nothing, everything is under control."[1]

---

1. This statement is virtually the same as evidence excluded in the first trial which the Supreme Court held was prejudicial error to exclude. 302 N.C. at 500-02, 276 S.E. 2d at 345-46.

Lt. Ashley was allowed to testify that on 28 February 1980 he talked to Torain. Torain told him that on the night of the shooting Hamlette drove the car, turned it around, pulled up to the telephone booth and shot the victim. After the shooting, Torain got out of the car at Roy Paylor's place and ran.

Det. Steve Clayton and Lt. Donnell Clayton testified that Earl Torain was also arrested and charged with the shooting. Lt. Clayton testified further that he and Lt. Ashley talked to Torain on a Thursday shortly after the shooting. They asked him about the gun and told him they needed it. The trial court then excluded the following testimony of Lt. Clayton:

A. I think after he finished giving the statement, I told him that we needed the gun and I asked him did he think that he could get the gun, and he said that he didn't—he didn't know, he'd try.

Q. Did he tell you where he had found the gun?

A. He told me that he found the gun in the ditch not far from an old place called the Chicken Shack on the Clay Road where he thought that the subject, where he thought Hamlette threw the gun out.

Q. All right. Did he tell you how long the gun had been in his possession?

A. He told me when he called me that he had just got back to the house after he had found the gun, so evidently he just found it then.

Lt. Donnell Clayton was then allowed to testify that on 6 March 1980 Torain called and informed him that he had the gun and on that same date Torain delivered the gun to him. The gun was wrapped in a towel. Both were in a brown paper bag.

Defendant contends this excluded evidence corroborates his version of the shooting that Torain is the guilty party and its exclusion was prejudicial to the defendant. We agree.

The applicable principles of law regarding the introduction of evidence tending to show that someone other than the defendant committed the crime charged are stated in *Hamlette I.*

> A defendant may introduce evidence tending to show that someone other than defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible . . . (Citations omitted.) "[T]he admissibility of another person's guilt now seems to be governed, as it should be, by the general principle of relevancy under which the evidence will be admitted unless in the particular case it appears to have no substantial probative value." 1 Stansbury's N.C. Evidence, § 93 at 302-03 (Brandis rev. 1973).

302 N.C. at 501, 276 S.E. 2d at 346.

The excluded evidence goes beyond inference or conjecture. It is all relevant as direct or corroborative evidence pointing directly to Torain as the guilty party and should have been admitted. Its exclusion was prejudicial error.

## V

[5]  Defendant next contends that the trial court committed error in the admission of negative testimony by Det. Clayton and Lt. Clayton.

Over defendant's objection, Det. Clayton testified that in the course of his investigation he was not able to establish that Earl Torain had taken any part in the killing of Willard Bailey; nor was he able to determine exclusively whether the gun in evidence had anything to do with the death of Willard Bailey.

Over defendant's objection, Lt. Clayton testified that in the course of his investigation he never found any evidence to establish that Earl Torain had shot Willard Bailey.

Defendant argues that the testimony was inadmissible as negative evidence and as an improper expression of opinion on the ultimate facts of the case. The State contends the witnesses were qualified to testify concerning information within their own knowledge resulting from their own investigations.

Our courts have defined negative evidence as testimony that an alleged fact does not exist. *Johnson & Sons, Inc. v. R.R. and Johnson v. R.R.*, 214 N.C. 484, 199 S.E. 704 (1938). *See also Black's Law Dictionary*, 4th Ed., Rev. 1968. In allowing negative

testimony that a deceased did not have large sums of money, this
Court stated:

> Negative evidence is not inadmissible merely because it is
> negative . . . Upon a showing that a witness was in a posi-
> tion to know of the existence of a fact had it been true,
> negative testimony as to the nonexistence of the fact is not
> incompetent . . . There was testimony tending to show that
> both witnesses were familiar with decedent's financial condi-
> tion and were in a position to know whether decedent
> possessed large sums of money on the days in question. The
> weight to be accorded this negative testimony was a question
> for the jury. (Citations omitted.)

*Archer v. Norwood*, 37 N.C. App. 432, 435, 246 S.E. 2d 37, 40
(1978). In *State v. Tedder*, 258 N.C. 64, 66, 127 S.E. 2d 786, 787
(1962) the court stated:

> [A] witness is not competent to testify as to the nonexistence
> of a fact when his situation with respect to the matter is such
> that the fact might well have existed without the witness be-
> ing aware of it.

A similar principle is stated in *Vann v. Hayes*, 266 N.C. 713, 716,
147 S.E. 2d 186, 188 (1966). The question subject to negative
testimony concerned whether headlights were burning on a car.
The court stated:

> With respect to negative evidence, that is, that one did not
> see or one did not hear, it was meaningless if the non-seeing
> or non-hearing are equally consistent with the occurrence of
> the events themselves. The showing that a witness was in a
> position to hear or see or would have heard or would have
> seen is a prerequisite to the admissibility of negative
> evidence that the witness did not hear or see. In the absence
> of such preliminary showing negative testimony does not
> possess sufficient probative force to require its submission to
> a jury.

The testimony objected to here is negative testimony. The
essential question therefore, is whether the officers' position with
respect to the matter was such that they would have known of
the existence of the fact had it been true.

The record shows that Det. Clayton's investigation and Lt. Clayton's involvement in the case were limited.[2] When Det. Clayton arrived at the scene of the shooting, Officer Betterton informed him as to matters Bailey stated to her. Det. Clayton then spoke with Bailey, who corroborated Betterton's report. Shortly after midnight he obtained arrest warrants for Hamlette and Torain on charges of assault with a deadly weapon inflicting serious injury with intent to kill. He arrested Hamlette during the early morning hours of 22 February 1980, but was unable to locate Torain. Torain was subsequently arrested, but Det. Clayton did not participate in his arrest. Det. Clayton searched Hamlette's car and apartment and found no evidence connected to the crime. On 6 March 1980 he received a bag containing a towel and a .32 caliber pistol from Lt. Clayton and sent this evidence to the SBI for analysis. The Roxboro Police Department failed to test the gun for fingerprints and no paraffin tests were performed on Hamlette. Det. Clayton did not know how Lt. Clayton obtained the gun.

In late February 1980 Torain approached Lt. Clayton to talk to him about the shooting. He directed Torain to Lt. Ashley who was the assigned investigating officer in the case. Lieutenants Clayton and Ashley interrogated Torain, who stated that Hamlette shot Bailey. On 6 March 1980 Torain gave Lt. Clayton a bag containing a towel and a .32 caliber pistol. Lt. Clayton delivered the bag and its contents to Det. Clayton. Lt. Clayton was unable to identify the pistol at the time of the retrial.

The extent of Det. Clayton's investigation and Lt. Clayton's involvement in this case was insufficient to form an adequate basis for admission of their negative testimony. Neither Det. Clayton nor Lt. Clayton, without relying upon statements made by others, was in a position to know first hand that Torain did or did not take part in the shooting or that the gun in evidence was or was not the weapon used in the shooting. This particular negative testimony was inadmissible hearsay evidence in that its value for truthfulness depended in part upon the veracity or com-

---

2. Lieutenant Clayton was not an investigator in the case. The question asked of him assumed that he was an investigator when in fact he was not. His only involvement was to direct Torain to Lt. Ashley, the assigned investigator, whom Lt. Clayton assisted in taking a statement from Torain and to deliver a bag and its contents to Detective Clayton.

petency of some other person. The negative testimony was also inadmissible because it was no more than conjecture and speculation. The admission of this evidence was prejudicial error.

In light of our holding that the evidence was improperly admitted, we do not find it necessary to address defendant's other assignments of error regarding this testimony.

Defendant is entitled to a new trial.

New trial.

Chief Judge MORRIS and Judge BECTON concur.